CONSTANTINE P. PAPPAS, SR., Adm'r of the Estate of Constantine Pappas, Jr., Deceased, Plaintiff-Appellant, v. STANLEY FRONCZAK *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—91—2576

Opinion filed June 28, 1993.

Kane, Obbish, Propes & Garippo (Susan G. Feibus and Lorna E. Propes, of counsel) and Patricia C. Bobb & Associates, both of Chicago, for appellant.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Norman J. Barry, Jr., Michael A. Pollard, and Karen Kies DeGrand, of counsel), for appellees.

JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiff, Constantine P. Pappas, Sr., administrator of the estate of Constantine Pappas, Jr., deceased, appeals from a judgment entered following a jury verdict in a medical malpractice case brought against defendants Stanley Fronczak and Luis Yarzagaray. Plaintiff's position at trial was that the defendants deviated from the applicable standard of care by failing to take the necessary measures to diagnose, prior to its rupture, the presence of a posterior fossa mass or aneurysm within the back of the deceased's lower brain.

On appeal, plaintiff alleges the following grounds for reversal: (1) the jury's verdict is against the manifest weight of the evidence; (2) the trial court erred in allowing one of plaintiff's treating physician to give defense-oriented expert opinion testimony at trial where he was undisclosed as a Rule 220 (134 Ill. 2d R. 220) expert and where such testimony violated a pretrial agreement between the parties; (3) the trial court erred in limiting plaintiff's attempt to expose financial bias during his cross-examination of a defense expert; and (4) the trial court erred by making a ruling which effectively prevented plaintiff from using a demonstrative exhibit at trial. For the reasons which follow, we affirm.

On August 23, 1974, plaintiff's decedent (Gussie) was born. Gussie had a normal and healthy childhood. In July 1978, Gussie and his mother (Lucy) were in an automobile accident. Shortly after the accident, Gussie began to complain of headaches. From 1978 to 1982, there was no set pattern to Gussie's complaints. Gussie's pediatrician, Dr. Miro Petani, knew of the headaches but did not consider them to be serious.

On November 25, 1982, Gussie awoke with a headache unlike anything he had previously experienced. His head was cocked to the

left side and he could not move his neck. He complained of terrible pain in his head. The pain continued throughout the day and into the night. In the early morning hours of Friday, November 26, 1982, Gussie's father (Gus) took Gussie to the emergency room of Northwest Community Hospital.

At Northwest Community Hospital, X rays were taken of Gussie's neck. Gussie was recommended to see a neurosurgeon right away. At 11 a.m. Friday, Gus took Gussie to see Dr. Pecson at Alexian Brothers Hospital. Dr. Pecson told Gus to monitor Gussie at home. If his condition did not improve, he should be taken to his pediatrician.

Gussie's condition did not improve, so Lucy took Gussie to see Dr. Petani. Dr. Petani arranged for Gussie to be seen by defendant Dr. Fronczak, a neurosurgeon at Oak Park Hospital. Dr. Fronczak was employed by defendant Dr. Yarzagaray. Dr. Yarzagaray was on vacation until the following Monday, November 29, 1982.

On Saturday morning, November 27, 1982, Lucy and Gus met Dr. Fronczak at the Oak Park Hospital emergency room. Gussie's condition was the same: he was complaining of a bad headache and a stiff neck; he had a fever; and he could not sleep.

Dr. Fronczak examined Gussie and the X rays from Northwest Community Hospital. Dr. Fronczak learned about the 1978 automobile accident and Gussie's sporadic headaches. He admitted Gussie into Oak Park Hospital that day, where Gussie would remain for the next 10 days.

Dr. Fronczak suspected that Gussie might have a neurological problem. In particular, he suspected meningitis or a tumor or mass near the posterior fossa, which is the area at the back and lower part of the brain. To rule out meningitis, Gussie received a spinal tap. The results were normal. To rule out a posterior fossa mass, Dr. Fronczak performed a CT scan on Gussie's skull. It too produced normal results.

From Saturday through Sunday, Gussie's condition did not improve according to his father. He continued to have a stiff neck and periodic pain attacks.

Dr. Fronczak called in Dr. Thomas Sullivan, a pediatric neurologist to examine Gussie. Dr. Sullivan examined Gussie on Sunday, November 28, 1982. Dr. Sullivan spoke with Gussie's parents, reviewed his history and the results of the CT scan and spinal tap, and conducted a neurologic examination. Dr. Sullivan believed that Gussie's problem was caused by a viral infection or a lesion in the spinal cord.

Dr. Sullivan recommended a CT scan of Gussie's cervical spine, which revealed no abnormalities, medication to relieve Gussie's pain and neck stiffness, and that a myelogram be considered the following work week if Gussie did not improve. A myelogram is an invasive procedure which involves injecting a dye into the patient's spinal fluid. The dye is traced through the structures of the spinal column. Myelograms pose risks to the person injected, such as infections, allergic reactions, nerve damage and seizures. Dr. Sullivan never saw Gussie again following his examination.

On Monday morning, defendant Dr. Yarzagaray examined Gussie and reviewed the results of the previous tests. Dr. Yarzagaray did not have an answer to what was causing Gussie's problem. The existence of a posterior fossa mass was still a possibility because of Gussie's continued irritability and neck pain. He did not order a myelogram or an arteriogram because there was no clinical indication for these tests. Gussie's pain was affecting his behavior, including causing him to exaggerate its existence.

From Monday, November 29 until the following Monday, Gussie remained at Oak Park Hospital. Gussie's condition during this time was the subject of much testimony at trial. The conflict centered on whether his headaches, neck pain and irritability improved or whether he generally exhibited the same symptomology, subject only to daily fluctuations. During this time, Gussie did not receive a myelogram, arteriogram or a second CT scan to confirm the negative results of the first CT scan. Oak Park Hospital did not have the capability to conduct a myelogram or arteriogram on Gussie.

On Monday afternoon, December 6, 1982, Gussie was transferred to Children's Memorial Hospital for further observation and tests. At about 3 a.m. on Tuesday, December 7, 1982, an undiagnosed aneurysm in Gussie's brain ruptured causing him to become comatose. Gussie died on January 4, 1983.

At trial, the parties contested whether the first CT scan taken at Oak Park Hospital of Gussie's skull in fact revealed that part of Gussie's brain which contained the aneurysm which eventually killed him. Plaintiff contended that it did not, while defendants argued the CT scan revealed that part, but failed to disclose any problem.

The parties also contested whether Gussie should have been transferred to another hospital earlier so that other diagnostic tests could be performed which could have more conclusively ruled out the presence of the posterior fossa mass or aneurysm which killed Gussie. Gussie's condition during his stay at Oak Park Hospital im-

plicated whether an earlier transfer or the performance of more invasive tests was necessary.

Plaintiff first argues that the jury's verdict was against the manifest weight of the evidence. We disagree.

A jury's verdict on contested factual issues will not be disturbed on review unless it is against the manifest weight of the evidence. (*Tedrowe v. Burlington Northern, Inc.* (1987), 158 Ill. App. 3d 438, 444, 511 N.E.2d 798, *appeal denied* (1987), 117 Ill. 2d 554, 517 N.E.2d 1096.) Where there is evidence in favor of the defendant which, if believed, supports the verdict in favor of defendant, the reviewing court should not set aside a jury determination. (*Tedrowe*, 158 Ill. App. 3d at 444.) "[T]he test is not whether the evidence *could have* supported a verdict for the movant if contrary inferences were drawn but whether a contrary verdict is clearly evident." (Emphasis in original.) (*Tedrowe*, 158 Ill. App. 3d at 444.) In considering this issue, we must view the evidence in the light most favorable to the appellee. *Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 412, 476 N.E.2d 1232.

■ Plaintiff has failed to meet his burden on review. Plaintiff's brief on this issue reads like a closing argument. However, what verdict this court would have reached had we been the trier of fact is not the issue. Rather, the issue is whether a contrary verdict is clearly evident. After applying this test to the evidence presented below, we cannot say that a contrary verdict is clearly evident.

■ Plaintiff's second argument on appeal is that the circuit court erred in allowing Dr. Thomas Sullivan, the pediatric neurologist who examined Gussie on the first Sunday of his hospitalization at Oak Park Hospital, to opine that Gussie's condition "improved" between the time of this examination and Gussie's release from Oak Park Hospital. Plaintiff asserts that because Dr. Sullivan's testimony was not based upon his personal observations of Gussie (he did not observe Gussie any time after this visit), but rather upon the notations of others within Gussie's medical records, Dr. Sullivan should have been disclosed under Supreme Court Rule 220. Plaintiff further asserts that Dr. Sullivan's testimony violated an agreement between the parties not to question treating physicians about the standard of care.

Addressing the latter of plaintiff's arguments first, we find that Dr. Sullivan's testimony did not violate the parties' agreement. Plaintiff asserts on appeal that "the parties had an agreement that treating physicians would not be questioned at trial about standard of care issues." Dr. Sullivan, however, did not give standard of care

testimony. Rather, his testimony concerned whether Gussie "improved." While this testimony bore on the standard of care issue, his testimony cannot be stretched into becoming what it is not.

Turning to plaintiff's Rule 220 argument, this case presents the issue of when does a treating physician become subject to the disclosure requirements of Rule 220. Plaintiff posits the rule that a treating physician must be disclosed under Rule 220 when his medical testimony at trial is no longer based upon the personal knowledge which he gained during the course of treating the patient.

*Boatmen's National Bank v. Martin* (1993), 155 Ill. 2d 305, a recent Illinois Supreme Court case, requires that we reject plaintiff's argument. *Boatmen's* reiterated the court's prior position "that treating physicians are not subject to Rule 220(b)(1) disclosure." (*Boatmen's*, 155 Ill. 2d at 321.) However, *Boatmen's* also recognized that the "treating physician exception" is not unlimited: "That is not to say that, in all instances, treating physicians are never subject to Rule 220(b)(1) disclosure. (See *Kniceley v. Migala* (1992), 237 Ill. App. 3d 72, 77-78 (drawing distinction between 'examining' physicians and treating physicians).)" (*Boatmen's*, 155 Ill. 2d at 324.) *Boatmen's* articulated the following test to determine at what point a treating physician must be disclosed under Rule 220: "The test is in the nature of the physician's relationship and whether a related opinion could be expected to be formed through that involvement." (*Boatmen's*, 155 Ill. 2d at 324-25.) It is worth noting that this test is similar to the one which the supreme court had advocated in an earlier decision:

> "We agree with our appellate court that the question of whether a witness must be disclosed as an expert under Rule 220 depends on the expert's relationship to the case. If the expert is intimately involved in the underlying facts giving rise to the litigation and he would reasonably be expected to form an opinion through that involvement, then disclosure is not required. In such case, the opposing party is unlikely to be surprised by the testimony. On the other hand, where the expert's contact with the case is slight, or where the opinion rendered is unrelated to the expert's involvement in the case, then disclosure is required." *Wakeford v. Rodehouse Restaurants of Missouri, Inc.* (1992), 154 Ill. 2d 543, 549.

In this case, Dr. Sullivan is more like an "examining" physician than a treating physician. He saw Gussie once and had no contact with Gussie thereafter. Thus, we must look to "the nature of the physician's relationship and whether a related opinion could be ex-

pected to be formed through that involvement." (*Boatmen's*, 155 Ill. 2d at 324-25.) Or, as stated in *Wakeford*, we must ascertain whether "the opinion rendered is unrelated to the expert's involvement in the case." *Wakeford*, 154 Ill. 2d at 549.

We believe that Dr. Sullivan's opinion that Gussie "improved" was related to his involvement with Gussie. Dr. Sullivan's opinion was based in part on his own recollection of Gussie and in part on the notations within Gussie's medical records. Dr. Sullivan had recommended following his examination that a myelogram be "considered" the next week if Gussie did not improve. Whether Gussie did improve that next week, therefore, was not unrelated to Dr. Sullivan's examination of Gussie. Plaintiff's Rule 220 argument is accordingly rejected.

■ Plaintiff next contends on appeal that the circuit court erred by limiting his cross-examination of defense expert Dr. Kelvin Von Roenn. Specifically, plaintiff argues that the court should have allowed him to question Dr. Von Roenn about his retention and deposition testimony in a pending, unrelated medical malpractice action against Dr. Yarzagaray. Plaintiff makes the related argument that he should have been allowed to question Dr. Von Roenn to establish that he had been hired as an expert witness on defendants' behalf by the Illinois State Medical Society (ISMS); that Dr. Von Roenn was a member of ISMS; that in at least half of the cases where he had testified for the defense he was hired by ISMS; and that at the time of trial his partner was the president or vice-president of ISMS. Plaintiff asserts that his inability to cross-examine Dr. Von Roenn on these key matters significantly limited his ability to demonstrate Dr. Von Roenn's bias in favor of defendants.

Defendants respond that the circuit court properly exercised its discretion in granting their *in limine* motion to prohibit inquiry into these matters. They further assert that plaintiff was not prejudiced by these rulings because the cross-examination he did conduct sufficiently exposed Dr. Von Roenn's potential bias and partisanship:

"Q. And 90 percent of the reviews that you have done in medical malpractice cases have been on behalf of physicians who are being sued; is that right?

A. I think that, yes, 80 to 90 percent would be correct.

Q. You have, in the past, reviewed cases from Mr. Barry's law firm, have you not?

A. Yes.

Q. 10 to 12 times, I believe, Does that sound about right?

A. Oh, I think probably more like 14, 15.

Q. All right. And how much do you make an hour when you review cases for Baker & McKenzie, sir?

A. I charge the same for everyone, $250 an hour.

Q. All right. And you charge for appearing in court here today?

A. The same.

* * *

Q. And have you met Dr. Yarzagaray before at some neurological conferences?

A. Yes, I have."

We find that the circuit court properly exercised its discretion in limiting plaintiff's cross-examination of Dr. Von Roenn. While the principal safeguard against errant expert testimony is the opportunity of opposing counsel to cross-examine, which includes the opportunity to probe bias, partisanship or financial interest (*Trower v. Jones* (1988), 121 Ill. 2d 211, 217, 520 N.E.2d 297; *Sears v. Rutishauser* (1984), 102 Ill. 2d 402, 407, 466 N.E.2d 210), limitation of cross-examination of a medical expert rests within the sound discretion of the trial judge (*Sears*, 102 Ill. 2d at 407-08), whose discretion will not be disturbed on review absent a showing of an abuse thereof and prejudice (*Connelly v. General Motors Corp.* (1989), 184 Ill. App. 3d 378, 390, 540 N.E.2d 370). Also, "[t]horough cross-examination of medical doctors must be tempered with protection of the doctor-patient privilege, * * * subtrials on issues remote from the subject of the lawsuit should be avoided" and "[r]eferences to prior testimony for the same party must be controlled by the trial judge." *Sears*, 102 Ill. 2d at 407-08.

In *Sears* and *Trower*, our supreme court established certain "safe harbors" with respect to the proper cross-examination of medical experts. Counsel may be permitted to inquire regarding "(1) the annual income derived from services relating to serving as an expert witness and (2) the frequency with which the witness' testimony in prior cases had been for 'people suing doctors.' " (*Trower*, 121 Ill. 2d at 222.) The expert may also be cross-examined regarding the number, frequency and financial benefit of patient referrals from the adverse party's attorney. *Sears*, 102 Ill. 2d at 409.

In this case, plaintiff has failed to show an abuse of discretion. First, relative to the proffered questioning concerning Dr. Von Roenn's prior deposition testimony on Dr. Yarzagaray's behalf, the parties agree that this testimony occurred in an unrelated, pending medical malpractice case. True, *Sears* expressly states that "[a] medical expert can be questioned about * * * prior testimony for the

same party." (*Sears*, 102 Ill. 2d at 408.) However, language within *Sears* demonstrates that this avenue of cross-examination is not without limitation. If plaintiff were allowed to ask the question he proffered during the *in limine* hearing—"Dr. Von Roenn, you have given a deposition on behalf of Dr. Yarzagrary before, have you not?"—defense counsel would be compelled to inquire into what that case involved in order to show the basis for the testimony in that case. Indeed, defense counsel so argued during the hearing, and the trial court acknowledged the problem of interjecting another lawsuit into the present case. *Sears* also compels that courts be concerned with the doctor-patient privilege. Given the length of the proceedings already, the danger of interjecting an unrelated issue into the present case, the discretion which trial judges have in limiting this sort of "prior testimony" cross-examination (*Sears*, 102 Ill. 2d at 408), and the cross-examination testimony which plaintiff did elicit, no abuse of discretion has been shown.

Relative to plaintiff's proposed inquiries regarding ISMS, the trial court could properly exclude these questions on the ground that they would have interjected the issue of liability insurance into the case. It is generally reversible error to inform the jury in a negligence action as to the existence or absence of insurance. The fact that a person is insured, or not insured, has no possible bearing on the question of negligence. *Huber v. Seaton* (1989), 186 Ill. App. 3d 503, 507, 542 N.E.2d 464.

Here, the trial judge believed that the proffered questioning could indirectly interject the issue of liability insurance into the case. While plaintiff asserts that he could pose any questions in such a manner that the word "insurance" would not arise, the risk still existed that the jury would nevertheless make an insurance connection. Further, plaintiff did cross-examine Dr. Von Roenn about how often he worked as an expert on the behalf of doctors being sued, how often defense counsel referred cases to him, and that Dr. Von Roenn knew Dr. Yazagaray from prior neurological conferences. The ruling, therefore, resulted in little prejudice to plaintiff as Dr. Von Roenn's defense bias was exposed. For these reasons, we find no error in the trial court's handling of Dr. Von Roenn's cross-examination.

■ Plaintiff finally contends that the circuit court erred in prohibiting the use of plaintiff's exhibit 65, "a demonstrative exhibit that accurately summarized portions of Gussie's medical records." We disagree.

Plaintiff exhibit 65 was a large board containing two charts. The first chart was entitled "DIAGNOSTIC TESTS DONE ON GUSSIE PAPPAS AT OAK PARK HOSPITAL." The second chart bore the heading, "TESTS DONE OF GUSSIE PAPPAS THAT COULD HAVE DETECTED A POSTERIOR FOSSA LESION." The charts covered the time between Gussie's initial hospitalization, Saturday, November 27, 1982, and his release, Monday, December 6, 1982. Each chart was broken into subheadings, with each day of Gussie's stay being a new subheading. Each subheading in turn listed the name of any test performed on Gussie for that particular day. If no tests were performed on Gussie that day, then the phrase "NO TESTS" appeared. The trial court refused to allow plaintiff to reveal any portion of exhibit 65 that carried the "no tests" language. The court's ruling effectively rendered the exhibit useless.

The admission of demonstrative evidence is within the discretion of the trial court. (*Bugno v. Mt. Sinai Hospital Medical Center* (1990), 201 Ill. App. 3d 245, 250, 559 N.E.2d 1.) The evidence must be relevant, explanatory, accurate and not misleading. *Smith v. Ohio Oil Co.* (1956), 10 Ill. App. 2d 67, 76, 134 N.E.2d 526.

Plaintiff fails to show an abuse of discretion on appeal. The record demonstrates that doctors did perform diagnostic tests on Gussie every day of his hospitalization. Gussie received neurological examinations every day while at Oak Park Hospital. Contrary to plaintiff's exhibit 65, the evidence showed a neurologic examination to be a diagnostic test which may reveal the presence of a posterior fossa mass. We must accordingly agree with the trial court that the "no tests" language of plaintiff's exhibit 65 was misleading.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

CAMPBELL and BUCKLEY, JJ., concur.