893 A.2d 625

**Seth GOLDBERG**

v.

**Billy BOONE.**

**No. 558, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

March 1, 2006.

412

Albert D. Brault (Bradford J. Roegge, Joan F. Brault, Brault Graham, LLC, on brief), Rockville, for appellant.

Patrick A. Malone (Denis C. Mitchell, Stein, Mitchell & Mezines, on brief), Washington, DC, for appellee.

Panel MURPHY, C.J., EYLER, DEBORAH S. and MEREDITH, JJ.

MURPHY, C.J.

In the Circuit Court for Montgomery County, Billy Karl Boone, appellee, filed a medical malpractice action against appellant Seth M. Goldberg, M.D.[1] Appellee's complaint included the following assertions:

5. On January 6, 2000, [appellant] performed an outpatient procedure on [appellee] to remove a cholesteatoma[2] from his left middle ear.

6. In the course of the procedure, [appellant] penetrated the dura overlying [appellee's] brain. This caused an injury to the left temporal lobe immediately below the operative site.

7. Penetrating the dura and injuring the brain violated the standard of care for a surgeon performing this procedure.

8. [Appellant] also failed to obtain a full [informed] consent for this procedure.

---

1. Appellee also sued Dr. Goldberg's professional corporation, Aesthetic Facial Surgery Center of Rockville, Ltd. Both appellants will be referred to collectively as "appellant" and/or "Dr. Goldberg."

2. The PDR Medical Dictionary 330(1st ed.1995) defines "cholesteatoma" as a mass of keratinizing squamous epithelium and cholesterol in the middle ear, usually resulting from chronic otitis media, with squamous meaplasia or extension of squamous epthelium inward to line an expanding cystic cavity that may involve the mastoid and erode surrounding bone.

9. [Appellant's] negligence caused a serious and permanent brain injury to Mr. Boone.

The jury that tried this case was presented with a special verdict sheet that included the following questions:

1. Do you find that the defendant, Seth M. Goldberg, M.D. breached the standard of care in his performance of a radical mastoidectomy performed upon Billy K. Boone?

 _____YES _____NO

2. If your answer to Question No. 1 is "No", then go to Question No. 3. If your answer to Question No. 1 is "Yes", do you find that the breach in the standard of care was a proximate cause of the Plaintiff's injuries?

 _____YES _____NO

3. Do you find that the Defendant, Seth M. Goldberg, M.D., failed to adequately advise the Plaintiff of the risks of his radical mastoidectomy procedure? If your Answer to Question 3 is "Yes", then go to Question 4.

 _____YES _____NO

4. If your answer to Question No. 3 is "Yes", do you find that the failure to adequately advise the Plaintiff of the risks of the radical mastoidectomy was a proximate cause of the Plaintiff's injuries?

 _____YES _____NO

5. If your answer to Question No. 2 or No. 4 is "Yes", what amounts of damage do you award?

 Past and Future Earning Capacity

 $_____

 Past and Future Medical and Related Expenses

 $_____

 Non–Economic Damages

 $_____

The jury answered "Yes" to the first four questions, and awarded appellee a total of $943,000.00.[3]

---

**3.** The jury awarded appellee $113,000.00 for past and future earning capacity, $355,000.00 for past and future medical expenses and $475,000.00 for non-economic damages.

Appellant filed two post-trial motions: (1) a Motion for Judgment Notwithstanding the Verdict, or, in the alternative, for New Trial, and (2) a Motion for New Trial Concerning [Appellee's] Future Medical Damages and for Appointment of Conservator. Both motions were denied and this appeal followed, in which appellant presents seven questions for our review:

I. Whether the trial court erred in submitting to the jury the issue of informed consent in the absence of evidence of proximate cause?

II. Whether the trial court erred in submitting to the jury the issue of whether the failure to advise [appellee] of the availability of a specialist violated the standard of care, in the absence of evidence of proximate cause?

III. Whether the trial court erred in allowing Beverley Whitlock to testify at trial when she was not disclosed as a potential expert witness as required by the trial court's scheduling order?

IV. Whether the trial court erred in denying [appellant's] motion for mistrial on the grounds that [appellee's] counsel intentionally introduced improper and inflammatory evidence concerning the recent sniper shooting, coupled with a claim that the Defense experts were hired as "paid minimizers"?

V. Whether the trial court erred in precluding evidence and argument that a verdict for Mr. Boone would have an impact on Dr. Goldberg's reputation and career?

VI. Whether the trial court erred in precluding evidence and argument concerning the common good?

VII. Whether the trial court abused its discretion in failing to grant Dr. Goldberg's post-trial motions or at least to give them adequate consideration?

For the reasons that follow, we are persuaded that (1) although appellee's "informed consent" claim should not have been presented to the jury, the verdict in favor of appellee on his "negligence" claim should not be disturbed, and (2) although appellant is not entitled to a new trial on the issue of negligence, he is entitled to a new trial on the limited issue of damages. We shall therefore (1) reverse the judgment entered on the informed consent claim, (2) vacate the judgment entered on the negligence claim, and (3) remand for a new trial on the issue of damages caused by appellant's negligence.

## I. & II.

Appellant's first post-trial motion was accompanied by a memorandum that included the following arguments:

Prior to instructing and submitting the special verdict form to the jury, the Court heard the Defendants' motion for judgment on the Plaintiff's informed consent claim. The Defendants' motion was based on the fact that the Plaintiff failed to present any evidence to show that Dr. Goldberg's failure to provide an informed consent proximately caused the Plaintiff's injuries. *Sard v. Hardy*, 34 Md.App. 217, 367 A.2d 525 (1976). The Court denied the Defendants' motion for judgment but recognized that it may involve an appealable issue of law for the Court of Special Appeals.

Appellee's responsive memorandum included the following arguments:

The Test of what should be disclosed to the patient contemplating surgery is whether a risk or alternative is "material" to the decision of a reasonable patient. *Sard*, 281 Md. at 443–44, 379 A.2d at 1022. In this case, there were two types of information about which the plaintiff presented evidence: first, that the plaintiff was at risk for brain injury due to this pre-existing hole in the skull from the prior surgery, and second, that other more experienced specialists were available in the area who could perform the surgery at less risk of a brain injury. Dr. Samuel Selesnick, plaintiff's expert in mastoid surgery, testified that the risk of injury

would be significantly lowered in more experienced hands. Dr. Selesnick also commented that Dr. Goldberg's record of having done only one mastoidectomy revision procedure in the three years before the injury was not substantial experience going into a potentially difficult revision surgery like Mr. Boone's. Dr. Selesnick said that Dr. Goldberg should have considered referring the patient to a specialist in ear and mastoid procedures.

. . . .

To the plaintiff's knowledge, Maryland appellate courts have not considered the precise causation issue posed by Dr. Goldberg. However, the supreme courts of Wisconsin and New Jersey have done so, and both have rejected similar defense arguments.

In *Johnson v. Kokemoor,* 199 Wis.2d 615, 545 N.W.2d 495(1996), the Wisconsin Supreme Court considered an informed consent claim by a patient who had been rendered partly quadriplegic by an aneurysm-clipping procedure in her brain conducted by the defendant neurosurgeon. The plaintiff's evidence was that the defendant had overstated his own experience in the procedure, had downplayed the risks, and had failed to advise the plaintiff of the availability of more experienced surgeons to do the procedure at less risk. . . . *Kokemoor* was cited with approval by the Maryland Court of Appeals in *Dingle v. Belin,* 358 Md. 354, 370, 749 A.2d 157, 165 (2000), on the issue of a surgeon's duty to disclose more than just routine information about the proposed surgery. However, the court in *Dingle* never reached the causation issue.

In *Howard v. University of Medicine and Dentistry of New Jersey,* 172 N.J. 537, 800 A.2d 73 (2002), the neurosurgeon was alleged to have overstated the number of procedures he had done like that proposed for the plaintiff and also to have misstated that he was board-certified. The plaintiff was rendered paralyzed by the surgery. . . .The court went on to establish a two-pronged causation inquiry that required the plaintiff to prove, first, "that the additional undisclosed risk posed by defendant's true level of qualifica-

tions and experience increased plaintiff's risk of paralysis from the corpectomy procedure," and second, "whether that substantially increased risk would cause a reasonably prudent person not to consent to undergo the procedure." 800 A.2d at 84–85. In other words, the plaintiff was required to prove a causal nexus between the lack of experience/credentials and the risk of the bad outcome that the plaintiff actually suffered. Mr. Boone had such testimony through Dr. Selesnick.

The plaintiff in the New Jersey case was not required to prove that a hypothetical alternative surgeon would have done the surgery successfully. Nor was the Wisconsin plaintiff in *Kokemoor* required to make such a showing. At most, the plaintiff need only prove that a reasonable patient would not have undergone the surgery with Dr. Goldberg because of the material risks of a worse outcome at his hands. Ample evidence existed to put that claim to the jury.

In the final analysis, however, the defendants have their own "causation" problem with the informed consent claim. Even if this court, or the Maryland Court of Appeals for that matter, was to side with Dr. Goldberg on this issue, it would not and could not change the final outcome of this case, because of the independent basis for judgment against Dr. Goldberg due to his direct negligence in performing the surgery. The only real issue of causative import is whether the trial was so infected with injustice as to warrant a new trial....

The record shows that the opening statement of appellee's counsel included the following comments:

Dr. Goldberg's people want to say that [appellee's] brain was very vulnerable beforehand, ... but even if you assume for a second that ... the injury ... was due to a thinning of the bone, and Mr. Boone being really vulnerable, ... the question is, how come Dr. Goldberg didn't tell him about that beforehand, and didn't tell him that he had a particular vulnerability, and didn't tell him that there are surgeons out there who are more specialized in this kind of surgery than

I am. Dr. Goldberg [should have said to Mr.] Boone, "I'm just a regular ear/nose/throat guy, and I think I'm competent to do mastoid surgery, but there are surgeons out there who do nothing but ear surgery and mastoid surgery, and your case is a little more complicated, your case might have a risk of brain injury, so you might want to consider going to one of those people."

Appellee's case included the testimony of Dr. Samuel Hayden Selesnick. The following transpired during Dr. Selesnick's direct examination:

Q Did you form an opinion within a reasonable degree of medical probability about whether Dr. Goldberg violated the ... standard of care for a similarly situated surgeon doing this kind of surgery on Billy Boone?

A Yes, I did.

Q What is your opinion, sir?

A That he fell below the standard of care.

Q Why, in what ways?

A The surgery resulted in a brain injury that occurred from a penetrating injury to the brain during surgery, that's below the standard of care. Secondly, regarding the informed consent, the informed consent should include complications that occur within regional anatomical boundaries, including the brain, which is right near the mastoid.

\* \* \*

A And lastly, it would've been prudent for the physician to consider referring this patient to someone more expert in the care of this type of problem once it was understood that this was a complicated surgery. It was a revision surgery and there was exposed dura, the covering [of] the brain was already exposed prior to the surgery.

\* \* \*

BY [APPELLEE'S COUNSEL]:

Q Tell me, Dr. Selesnick, you had talked about giving the consent information about the possibility of brain injury to

the patient in this circumstance. Why is it your opinion that he should have done that?

A Well, even in primary mastoid surgery, not revision surgery, you should discuss potential risks, and complications, and alternatives with a patient. And the risks that you would discuss would be those that would make sense in the region that you're working. So, the facial nerve, for example, is a very good example. The facial nerve goes right through that area. You would talk about the risks of facial paralysis or of inner ear injury resulting in vertigo or deafness. But in that same way, the tegmen is the only bone that's really separating the inner part of the mastoid cavity from the brain so that you'd talk about intracranial complications as well.

Q Cranial complications meaning brain—

A Yes.

Q —possibly?

A Yes.

Q Okay. Now, another related issue I want to ask you about is, you talked about considering referral to a more experienced surgeon, or discussing that issue with the patient. Let me show you Plaintiff's Exhibit 42, which is something we subpoenaed from Shady Grove Hospital about the number of mastoid surgeries. In fact, I'll just put it on the board real quick, number of mastoid surgeries that Dr. Goldberg had done in the past few years. Over the course of 1997, and 1998, and 1999, according to Shady Grove Hospital, Dr. Goldberg had done a total

of 16 mastoidectomies, do you see that?

A I do.

Q And the kind of mastoidectomy that was done with Dr. Boone, would that be considered a revision mastoidectomy?

A Yes.

Q Okay. How many revision mastoidectomies do you see listed there?

A One.

Q Okay, in 1999, down there at the bottom?

A Yes.

Q Okay. You'd mentioned that you do these kinds of surgeries about how often per year?

A I do major ear surgery, which would include mastoidectomy, revision mastoidectomy, (inaudible) all the different types of, of ear surgery but not skull-base surgery, about 100 times, yeah.

Q Would there be surgeons in the Mid–Atlantic area down here, Washington, DC, Rockville, that kind of area, who would have similar experience as you in terms of being more specialized in doing this kind of surgery for a revision mastoidectomy?

A Certainly.

Q Okay. And so why is it your opinion that Dr. Goldberg should have discussed the possibility of the patient going to a more specialized kind of surgeon?

A He, he should've at least discussed the possibility of going to a more specialized surgeon so that the, the patient could be involved in the decision of, of the type of risks that the patient would want to entail, and clearly the risks would be different in those two situations.

Q I'm sorry, what, the risks would be different? What do you mean?

A That the risks would be different in someone that rarely did a revision mastoidectomy compared to the risks associated with someone who did routine (inaudible) mastoidectomies.

Q Why would the risks be different?

A Well, I, I think that the more you do something and the more comfortable you are, the less risk is, is entailed.

 Maryland's "informed consent" cases were recently summarized by this Court in *Arrabal v. Crew–Taylor,* 159 Md.App. 668, 862 A.2d 431 (2004), and by the Court of Appeals

in *Landon v. Zorn, et al.*, 389 Md. 206, 884 A.2d 142 (2005).[4] To generate a jury issue in an informed consent action, the patient must present evidence that the physician failed "to explain the pros and cons of some affirmative violation of the patient's physical integrity, such as performing surgery or injecting the patient." *Arrabal, supra,* 159 Md.App. at 683, 862 A.2d 431. In *Arrabal,* while affirming a judgment based upon a physician's negligent failure to advise a pregnant patient about the risk of prolonging her pregnancy, this Court held "that the trial court erred in denying appellant's motion for judgment as to the lack-of-informed-consent portion of plaintiffs' case," explaining:

> Dr. Arrabal's decision to take no affirmative action may have amounted to a violation of the professional standard of care, but he was not obliged to obtain his patient's consent to his non-action.

*Id.* at 685, 862 A.2d 431.

██ In the case at bar, appellee would have been entitled to assert an informed consent claim on the ground that he consented to the surgery *without* being told about the danger that he might suffer a brain injury. We are persuaded, however, that (1) a surgeon who is qualified to perform a particular operation does not have a duty to advise the patient that there are more experienced physicians in the locality, and (2) a claim that the defendant-physician negligently failed to recommend that the patient consult with a specialist or with a more experienced physician "is analyzed in relation to the professional standard of care." *Reed v. Campagnolo,* 332 Md. 226, 241, 630 A.2d 1145 (1993).

---

4. Maryland law distinguishes between (1) failure to provide information that constitutes a breach of the physician's duty to obtain the patient's informed consent, and (2) failure to provide information that constitutes negligence, i.e. a breach of the physician's professional standard of care. This distinction, which was drawn in *Reed v. Campagnolo,* 332 Md. 226, 630 A.2d 1145 (1993), was recently reaffirmed in *Landon v. Zorn,* 389 Md. 206, 884 A.2d 142 (2005), in which the Court of Appeals held that the negligent failure to advise the patient of the risk of not submitting to a diagnostic test did not give rise to an "informed consent" action.

In *Mitchell v. Kayem,* 54 S.W.3d 775 (Tenn.App.2001), the Court of Appeals of Tennessee reversed a judgment against an ear, nose and throat specialist based upon a jury verdict in favor of a patient who "conceded that she would have undergone [cancer] surgery whether or not the inherent risks of the procedure were disclosed, ... but ... would have sought a second opinion and would have chosen treatment at a Nashville facility." *Id.* at 778. Rejecting the argument that "different course of treatment" includes both (1) "a different medical procedure," and (2) "choosing a different surgeon to perform the same medical procedure," the *Mitchell* Court stated:

> Treatment is defined as "the action or manner of treating a patient medically or surgically" while procedure is defined as "a particular way of accomplishing something or of acting." *Merriam–Webster's Medical Desk Dictionary,* 728, 576 (1993). As we interpret the language in *Ashe [v. Radiation Oncology Assocs.,* 9 S.W.3d 119 (Tenn.1999)], treatment or procedure refers to the type of procedure and the manner of performing it rather than to the person performing the procedure.
>
> \* \* \*
>
> In summary, it is not disputed that the surgery was necessary to avoid progression of the disease and ultimately death.... Recognizing her condition, she ultimately conceded she would have had the surgery, regardless of whether the risks had been made known to her. She argues that she would have sought a more experienced surgeon. However, Dr. Kayem states in his affidavit that the risk of the complications suffered by Ms. Mitchell were greater because of her previous surgeries; ... the only alternative to Ms. Mitchell was the same surgical procedure performed by another surgeon; and the generally accepted occurrence rate of these unknown risks and complications of the procedures applies uniformly to all qualified surgeons, regardless of their skill level. Therefore, the possibility of the risks and/or complications occurring to Ms. Mitchell would not

have been different in the hands of another surgeon.... These statements in his affidavit are not refuted.

*Id.* at 781–82.

■ We agree with this analysis. While a physician obviously violates the standard of care by performing an operation that he or she is incompetent to perform, the duty to obtain the patient's informed consent does not require that the physician advise the patient that (1) "I might make a mistake during the surgery," or (2) "there are more experienced surgeons in the area who are less likely to make a mistake."

We reject the proposition that, in the absence of evidence that the physician has somehow misled the patient and/or was not qualified to perform a particular procedure, a patient in need of that procedure can assert an "informed consent" action on the ground that the physician who performed the procedure failed to advise the patient that there were other physicians in the locality who had even more impressive qualifications and/or experience.[5] For example, we decline to hypothesize that Dr. Selesnick's duty to obtain informed consent would include the duty to advise a candidate for surgery that—although he performs about 100 ear surgeries every year—there are surgeons in the area who perform about 200 ear surgeries every year.[6] We therefore hold that Dr. Goldberg did not breach his duty to obtain appellee's informed consent by failing to advise appellee that there were more experienced surgeons available in the local area.

---

**5.** The case at bar does not involve a claim that Dr. Goldberg (1) exaggerated his qualifications, or (2) misled appellee into believing that there were no other surgeons in the locality who had more experience.

**6.** Moreover, while a person who needs surgery is likely to want the surgery performed by the most skilled surgeon available, a patient who needs surgery within the next ten days is unlikely to insist that the surgery be delayed for three months because (1) the most highly qualified surgeon will not be available until that point in time, and/or (2) the patient wants the surgery performed in a particular operating room that is "booked" for that period of time. In the case at bar, appellee presented no evidence of what reasonable options would have been available to him if he had chosen to consult with more experienced surgeons.

 Appellant also argues that he was entitled to a motion for judgment at the conclusion of appellee's case-in-chief because appellee failed to produce evidence that (1) appellee would not have sustained a brain injury if the operation had been performed by a more experienced surgeon,[7] and (2) appellee never testified that, if he had been advised about the danger of a brain injury, he would not have consented to the surgery.[8] In light of our holding that the duty to obtain informed consent does not include the duty to advise the patient that there are more experienced physicians in the locality, we do not reach the merits of these arguments.

---

7. Appellee argues that such evidence is not required by *Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014 (1977), and that appellant's argument has been rejected by every appellate court that has considered this issue. According to appellant, however, no "provider-specific" informed consent claim can be submitted to the jury unless the patient/plaintiff produces evidence that a physician other than the defendant would have achieved a favorable outcome. "Had the patient chosen a different physician, or a different hospital, to perform the surgery, it is still possible that the same injury would have resulted. Even an alternative provider would have some adverse outcomes.... Accordingly, courts draw on proportional causation principles to resolve the causation dilemma." *Comparing Medical Providers: A First Look at the New Era of Medical Statistics*, 58 Brook. L.Rev. 5, 11 (1992).

8. In almost all "informed consent" cases, the patient/plaintiff asserts that, "I would not have consented *to the procedure* if I had been fully informed." In these situations, the patient/plaintiff is not required to produce evidence that a physician other than the defendant would have achieved a favorable outcome. In the case at bar, however, although appellee's evidence generated a jury issue on the question of whether appellant's duty to obtain informed consent was breached by appellant's failure to mention that a brain injury was a possible complication of the surgery, appellee never testified that he would have elected not to have surgery if he had received this information. Instead, appellee's theory of the case is, "if he had been fully informed (about the danger of a brain injury, and about the availability of more experienced surgeons), although he would have consented to a surgery performed by a more experienced surgeon, he would not have authorized Dr. Goldberg to perform the surgery." Appellee argues that (1) because his burden of production was satisfied by evidence of what he had not been told, he was not required to testify that he would not have granted appellant permission to perform the surgery, and (2) the jury was entitled to infer from the evidence that a fully informed reasonable person would not have consented to *appellant* performing the surgery.

■ From our review of the record, however, we also conclude that appellant is not entitled to a new trial on the ground that he was unfairly prejudiced by the submission of the informed consent claim to the jury. Like the case of *Arrabal v. Crew-Taylor*, *supra*, the case at bar involved both a lack-of informed consent claim and a negligence claim.

It is oftentimes the case in medical malpractice actions that the plaintiff will have two alternative theories as to why a treating physician is negligent. For example, if a doctor negligently performs an operation and the patient suffers surgical complications due to that negligence and also performs that operation without the patient's informed consent, the patient may proceed on the two negligence theories simultaneously, *viz:* the theory that plaintiffs suffered injuries because the doctor negligently performed the operation and the alternative theory that, if the defendant had provided the patient with the necessary information prior to surgery, a reasonable patient in the plaintiff's position would have declined the surgery. **In the foregoing hypothetical, no matter what theory prevailed, the damages would be the same.**

*Arrabal, supra,* 159 Md.App. at 688–689, 862 A.2d 431. (Emphasis added).

If the jury had resolved appellee's negligence claim in favor of Dr. Goldberg, but resolved appellee's informed consent claim against Dr. Goldberg, because of our holding that an informed consent claim cannot be based upon Dr. Goldberg's failure to advise the patient that there are more experienced physicians in the locality, we would have (1) vacated the judgment on the informed consent claim, and (2) remanded for a new trial at which appellee's informed consent claim would be based solely on the ground that he should have been advised about the risk of brain injury. In the case at bar, of course, (1) the jury actually found that Dr. Goldberg breached the standard of care by negligently performing the operation, and (2) the evidence was sufficient to support that finding. Under these circumstances, we are persuaded that appellee's "lack of experience" evidence was not admissible *only* on the

informed consent issue. We are also persuaded that there exists no reasonable possibility that a new trial on the issue of whether appellant negligently performed the operation would result in a different verdict on that issue. We therefore hold that appellant was not *unfairly* prejudiced by the fact that the jury was presented with both the negligence claim and the informed consent claim.

## IV.

■ Appellant's post-trial memoranda included the following arguments:

5. Counsel for the Plaintiff also made several inappropriate and inflammatory comments to the jury during the prosecution of his case and during closing arguments. The inflammatory comments were as follows:

a. During his cross-examination of the Defendants' neuropsychologist, David Schretlen, M.D., Plaintiff's counsel improperly implied that Dr. Schretlen had previously examined the notorious sniper defendant Lee Boyd Malvo and concluded that Malvo was "brainwashed" into committing the shootings and therefore was not culpable. Plaintiff's counsel specifically referred to the "sniper case" in his cross-examination of Dr. Schretlen and there was no question that the jury understood the reference. The defense counsel moved immediately for a mistrial, which was denied by the Court.

Appellee's responsive memorandum stated:

In an effort to show that Dr. Schretlen was a "minimizer or maximizer, as the case called for," plaintiff's counsel first brought out the fact that Dr. Schretlen (who is a Ph.D., not an M.D., as the defense inaccurately states)had testified in another recent trial that the plaintiff had only minimal disabilities despite flunking most of the neuropsychological tests he gave her. Plaintiff's counsel then brought out that Dr. Schretlen had tested a young man in a criminal case for eight hours and that the defendant had flunked only one of the battery of tests given. Dr. Schretlen agreed that this

was so. It was obvious to both counsel and the witness that although the name of the defendant, Lee Boyd Malvo, had not been mentioned, that was who counsel's query was directed at. The defense waited until next question to object. That question sought to "close the loop" by asking Schretlen to agree that despite Malvo only having failed one test, Schretlen was still willing to testify that the defendant might have been criminally insane when he participated in the Washington area sniper killings. After the objection, the court then instructed plaintiff's counsel to go no further along this line. Counsel complied. The issue of Schretlen's prior testimony never came up again.

The issue now is whether this single piece of evidence was so unfairly put into the case as to constitute grounds for a new trial by itself. The plaintiff disagrees. The sniper case was only mentioned in the context of showing Dr. Schretlen's "minimizer/maximizer" tendencies. If the defense thought that the identity of the case was so prejudicial that it should not be mentioned, the defense should have so moved in limine, or when the line of questions started. Schretlen's participation in the Malvo trial is a matter of public record and is listed on his list of cases in which he has testified, a list that was provided by defense counsel to plaintiff's counsel shortly before trial. (See attached.) The defense's failure to raise this issue until after "the cat was out of the bag" could be easily seen as an effort to sandbag.

The defense motion in essence seeks a mistrial. Nothing improper occurred, but even if it had, the appellate courts caution that "a mistrial is to be declared only where it is 'manifestly necessary,' or 'under urgent circumstances,' or 'only in very extraordinary and striking circumstances,' and declaring a mistrial is not 'to be lightly undertaken.'" *Owens–Illinois, Inc. v. Gianotti*, 148 Md.App. 457, 476–77, 813 A.2d 280, 291(2002), quoting *Cornish v. State*, 272 Md. 312, 318, 322 A.2d 880(1974). The Schretlen matter in no way reaches that threshold.

The record shows that appellant offered Dr. Schretlen as an expert in the field of neuropsychology, and that the following transpired during the *voir dire* of this witness:

Q.: ... I mean, you are hired here basically as a minimizer, aren't you?

[Appellant's Counsel]: Objection, Your Honor.

The Court: Overruled.

A.: I certainly didn't see myself as being a hired as a minimizer. I saw myself being hired as a neuropsychologist.

\* \* \*

Q.: Now the case before that [referring to a case where the doctor had previously been called as an expert witness], that you testified in court, was a criminal case, right?

A.: I'm not sure.

Q.: Okay. Well, you testified a young man, about 18 years old, and you did a daylong battery of tests on him and he tested abnormal in one or two of the tests, right?

A.: Oh yes. I know who you are speaking of.

Q.: Okay. He was only abnormal in one or two tests?

A.: That's right.

Q.: Okay. And that young man, you were willing to come into court and testify that he might have been brainwashed into murdering 10 people in the sniper thing, isn't that true?

[Appellant's counsel]: Objection, Your Honor.

A.: That is absolutely incorrect and outrageous.

The Court: Sustained

Q.: Well let's talk about it for a minute.

A.: Yes.

Q.: The young man's name—

[Appellant's counsel]: May we approach, Your Honor?

During the bench conference that followed, the circuit court sustained appellant's objection, explaining that the court was "not going to allow [appellee's counsel] to get into this area." The trial proceeded, and it was not until the following day that

appellant moved for a mistrial. The record shows that the following transpired at that point in time:

[Appellant's counsel]: I've been very concerned about cross-examination of Dr. Schetlen [sic] (inaudible) that's highly inflammatory and this is a hearsay issue, and counsel is in a calculated questioning [sic] brought out in his questioning that it was the sniper case he found that the defendant was brainwashed in which it was anyone who ever lived in this area knows what that is and that's Lee Malvo. It was on the front page of every paper in this area. The killings occurred near this courthouse. Everybody is involved and it was calculated to prejudice the Defense, even though after he had gotten the question out, the Court sustained the objection. My first concern is the damage had been done and accordingly, I respectfully move for a mistrial.

The Court: All right. [Appellee's Counsel]?

[Appellee's Counsel]: My intent was to bring out, and I have brought out previously that, I was trying to impeach his credibility on being a minimizer or a maximizer, as the case may call for, and in that case, the point was, and it was the most recent trial that he testified in before my other trial. It was right on his list and if they had any problem with me getting into it, they certainly could have mentioned it, but my point was that he testified—.

The Court: Well, they did. They objected.

[Appellee's Counsel]: No, but I mean, I mean, ahead of time because it was right on this list of, that [appellants' counsel] gave me a list of the man's testimonial appearances before he appeared and it was very prominent on the list. So my point was that he did an eight hour test on this other guy, found only one abnormal test in the entire eight hours and still was willing to come into Court and testify as he did, and I thought that was quite a legitimate contrast to, you know, coming into Court and saying that somebody else who has several abnormal test results is hardly damaging at all, and I agree, it's that's [sic] why I was trying to avoid the name of the case, but—

[Appellant's Counsel]: By using the sniper case?

[Appellee's Counsel]: Well, that's, it's probably more [sic] prejudicial than saying Lee Malvo.

The Court: Well, I mean, I've never had anybody do anything like that to me and I've been a trial lawyer a long time.

[Appellee's Counsel]: I did it in good faith and I thought it was quite legitimate a contrast based [sic], but he had a whole bunch of abnormal test findings and for me to just bring out, oh, you were the psychologist who testified for this guy, I agree. There'd [sic] be no reason to bring that out other than to try to prejudice the Defense, but I disagree. I think there was a definite linkage in the pattern of the man's testimonial and testing behavior.

[Appellant's Counsel]: The inference is clear from the questions was to remind the jury that Lee Malvo was a vicious murderer and this man, they know Le[e] Malvo is guilty and this man tried to get him off in some way. I don't know what tests he's talking about. I never saw the file. I never saw any transcripts. I have no information at all other than he demanded, which he is entitled to have by discovery, a 26(b)(4) list. We call them that because in the Federal rules, you're required to maintain that, as Your Honor knows. So he said he would like any list he's maintained under the Federal rules. We're required to give it to him and we did. And that doesn't mean that he can bring up anything on that list. He also bought up the, in his questioning, all of that mention of that same case he tried. I don't know anything about this case and he started talking like he is testifying about his client and how this man minimized a disability. I don't know what this case was about.

[Appellee's Counsel]: There was no objection to it.

The Court: There was no objection to it.

[Appellant's Counsel]: But before the objection about the Malvo thing, the key question that the man had answered was that in eight hours of testing, he only got one abnormal

test result out of the entire eight hours and that was in the springboard to saying nonetheless you were willing to question—

The Court: Well, I'm not saying I wouldn't sustain an objection to the other, but I think the purpose was clear or the inference was clear that [appellee's counsel] was trying to suggest that he was called regularly as a minimizer initially by your office and then when he went to the Malvo case, that essentially he's a hired gun, and then I think that was the purpose that he would, at least that's what I took, that he was trying to show that he would testify essentially for whoever hired him, whoever paid him.

[Appellee's Counsel]: Exactly.

The Court: And I don't think it rises to the level of a mistrial. So, I'm going to deny the motion for a mistrial.

According to appellee, because appellant's motion for mistrial was not made until the day after the allegedly improper questions were asked, the issue of whether a mistrial should have been granted on those grounds has not been preserved for our review. This Court has held, however, that the denial of a request for relief is preserved for our review if the record shows that it was presented to the trial court "at a time when the trial court could have corrected the error." *McCallum v. State*, 81 Md.App. 403, 419, 567 A.2d 967, *aff'd on different grounds, State v. McCallum*, 321 Md. 451, 583 A.2d 250 (1991). In *Banks v. State*, 84 Md.App. 582, 581 A.2d 439 (1990), this Court stated:

Requiring an objecting party, who volunteers, or is requested to give the basis, to state all reasons for the objection permits the court to focus its attention upon only those reasons deemed meritorious by that party, excusing it from considering the universe of reasons that might impact the decision. This ensures that the court will be afforded an opportunity to rule fully informed of the objecting party's position. When the court's attention has been so directed at the time that it rules, the objecting party may not advance other, more meritorious reasons after the ruling has been

implemented. To allow him or her to do so would be unfair to the court, since it would permit a party to sandbag the judge. Where, however the party provides the court with additional grounds for the objection before the action which the objection sought to avoid has occurred, the court is not sandbagged; it is afforded the opportunity of correcting any error it may have made. Therefore, since the purpose of the rule, and the policy underlying it, will have been met, those grounds are preserved for review.

*Id.* at 587–89, 581 A.2d 439. Moreover, it is well settled that the trial judge has discretion to grant a new trial on the basis of an argument that was not "preserved" during the trial. *Tierco v. Williams,* 381 Md. 378, 414, 849 A.2d 504 (2004); *Isley v. State,* 129 Md.App. 611, 622, 743 A.2d 772 (2000). We shall not decline to address this issue on the ground that it has not been preserved for our review.

▆▆▆▆ We recognize the general rule that "[w]hether to order a mistrial rests in the discretion of the trial judge, and appellate review of the denial of the motion is limited to whether there has been an abuse of discretion." *Medical Mutual Liab. Ins. Soc'y of Md. v. Evans,* 330 Md. 1, 19, 622 A.2d 103 (1993). The facts of that case, however, persuade us that (1) Dr. Schretlen should not have been asked any questions about his role in the Malvo case,[9] and (2) the danger of unfair prejudice against Dr. Schretlen that resulted from those questions entitle appellant to a new trial on the issue of damages.[10]

---

**9.** No person who reads this opinion is likely to learn for the first time that Lee Boyd Malvo was one of the two persons charged in the sniper shootings that occurred in the Washington D.C. area, beginning in October of 2002.

**10.** When the trial judge has decided that a curative instruction is sufficient to protect against the danger of unfair prejudice, we must determine " 'whether the evidence was so prejudicial that it denied the defendant a fair trial;' that is, whether 'the damage in the form of prejudice to the defendant transcended the curative effect of the instruction.' " *Medical Mutual,* 330 Md. at 19, 622 A.2d 103 (quoting *Rainville v. State,* 328 Md. 398, 408, 614 A.2d 949 (1992)) (citation omitted).

*Evans* involved a "bad faith" (failure to settle for policy limits) action in which the insurance company's claims manager testified on direct examination about why, in his opinion, the case did not call for "an offer [of] the policy limits." During the cross-examination of this witness, plaintiff's counsel sought to establish that the company's bias against plaintiff's counsel was the actual reason why the company refused to settle the claim for the policy limits. In doing so, plaintiff's counsel asked a series of questions about an otherwise unrelated case in which (1) plaintiff's counsel, representing a young woman whose ovaries and uterus had been removed, offered to settle her claim for $300,000.00, (2) the witness, who was handling that claim for the insurance company, made a $23,000.00 counter offer, and (3) a jury awarded the plaintiff $1,400,000.00. The following transpired at this point:

[Plaintiff's counsel]: You remember that, don't you?

A. Yes, I did.

Q. And as it turned out, the claim that that doctor assigned to my client, the same thing that the doctor in this case assigned to Mrs. Evans, the right to sue, and you subsequently paid the additional money.

[Defense counsel]: Objection.

At the conclusion of the bench conference that followed this objection, the circuit court denied the insurance company's motion for mistrial, opting instead to instruct the jury that it must "assess the evidence in this case and determine the facts with regard to this case based on what has been presented to you as to this case." In *Medical Mutual v. Evans,* 91 Md.App. 421, 604 A.2d 934 (1992), this Court stated:

We agree that the questioning about the other case was improper and prejudicial.... [Plaintiff's counsel] could simply have asked whether, in an earlier case, he had caused appellant to pay an amount in excess of its policy limits based on a charge that [the witness] had refused to settle the underlying claim within the policy limits and whether that episode had any influence on [the witness'] testimony in the present case. There simply was no need to get into the

nature of the earlier claim; it had no relevance whatever and patently, was injected not to show bias but rather to show prior bad conduct on appellant's part.

\* \* \*

[The circuit court] had the benefit of being able to gauge, far better than we can, the extent of the prejudice caused by [plaintiff's counsel's] questions and [the witness'] responses. This occurred, as we said, on the ninth day of the second trial in this matter. A great deal of evidence had already been presented, and the relatively brief colloquy complained of here has to be viewed in context of all that had previously occurred. On this record, we cannot properly conclude that [the circuit court's] opting for a curative instruction over a mistrial constitutes an abuse of discretion. We do, however, condemn the provocation that caused the problem.

*Id.* at 429–31, 604 A.2d 934.

The Court of Appeals reversed this Court's decision, holding "that the prejudice resulting from the improper cross-examination of [the claims manager] transcended the curative instruction, and that the trial court abused its discretion in denying the motion for a mistrial." *Medical Mutual v. Evans,* 330 Md. 1, 24, 622 A.2d 103 (1993). According to the Court of Appeals:

Under these circumstances, to embellish the improper "bad acts" questioning by stating that [the claims manager] had valued the unauthorized removal of a young woman's ovaries and uterus at $23,000 strongly suggests, if it does not compel, a conclusion that the primary purpose of the questioning was to embarrass and harass the witness. Given the fact that substantial segment of the jury in the instant matter was composed of women of child-bearing age, the likelihood is great that Med Mutual was additionally prejudiced by the suggestion of a parsimonious and insensitive reaction to an involuntary and irreversible sterilization of a young woman.

*Id.* at 21–22, 622 A.2d 103.

In the case at bar, the circuit court correctly determined that the questions at issue were asked "to show that [Dr.

Schretlen] would testify essentially for whoever hired him, whoever paid him." Appellee's counsel had the right to question Dr. Schretlen about being a "minimizer," but had no right to specifically reference the sniper case during this line of questioning. Presenting this information to a jury comprised of citizens who reside in the geographic area most closely associated with the sniper shootings created an even more extreme danger for unfair prejudice than the Court of Appeals found present in *Evans*.

In *Tierco, supra,* the Court of Appeals made it clear that in "the blatant case," and/or "exceptional" circumstances in which there would be "potential harm to the Maryland judicial system if this type of overt tactic were to be permitted to prevail," the party who was unfairly prejudiced by the unfair tactic is entitled to post-trial relief:

> The ultimate question is whether the prejudice was so great that it denied [appellant] a fair trial. *See Med. Mut. Liab. Ins. Soc'y of Maryland v. Evans,* 330 Md. 1, 19, 622 A.2d 103, 112 (1993).

*Tierco,* 381 Md. at 413–14, 849 A.2d 504.

Under these circumstances, it is of no consequence that the circuit court sustained appellant's objections to the improper line of questioning. "Impeachment should not be used as a sword to place otherwise inadmissible evidence before the jury when there is no reason whatsoever for eliciting the unfavorable testimony upon which the need for impeachment is predicated." *Bradley v. State,* 333 Md. 593, 606, 636 A.2d 999 (1994). We therefore hold that, because appellant was unfairly prejudiced by questions that alerted the jury to the fact that Dr. Schretlen testified on behalf of Lee Malvo, appellant is entitled to appropriate post-trial relief.

From our review of the record, however, we are persuaded that appellant is not entitled to a new trial on the issue of negligence. In *Stickley v. Chisholm,* 136 Md.App. 305, 765 A.2d 662 (2001), this Court held that, "for a partial new trial to be ordered, 'it must clearly appear that the effect of the error did not extend to all the issues tried,'" (quoting

with approval *McBride v. Huckins,* 76 N.H. 206, 81 A. 528, 531–32 (1911)). We also agree with the United States Circuit Court for the Fifth Judicial Circuit that,

> [a] jury's finding as to liability can be binding even though its monetary award is found to be excessive or even improperly influenced-our deference to and faith in the jury system demands at least this much. CF. *Pingatore v. Montgomery, Ward & Co.,* 6 Cir., 1969, 419 F.2d 1138, 1142–1143, cert. denied, 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90 (1970) (grossly improper argument required new trial as to damages only; substantial evidence supported jury verdict on liability). If the passion, prejudice, caprice, undue sympathy, arbitrariness or more taints only the damage award and not the liability assessment, the proper response is a remittitur or a new trial addressed to damages alone. See *Pingatore v. Montgomery Ward & Co.,* supra. But, if it appears that the improper jury action, in reasonable probability, affected both the liability and damages issues, then a new trial as to both issues must be ordered.

*Edwards v. Sears, Roebuck and Company,* 512 F.2d 276, 282–83 (5th Cir.1975).

In *Evans,* a new trial was required because the insurance company had been unfairly prejudiced by the improper "bad acts" impeachment of its employee, who had testified about the only issue that was of dispositive consequences in that case. In the case at bar, however, Dr. Schretlen was a nonparty witness whose testimony was limited solely to the issue of damages, and our review of the record persuades us that there exists no reasonable possibility that a new trial on all issues would result in a different verdict on the issue of appellant's negligence. Under these circumstances, we are persuaded that the unfair prejudice to Dr. Schretlen entitles appellant to a new trial on the issues of damages only.

## VII.

### Motion for Appointment of a Conservator

Although we have ordered a new trial on the issue of damages, we offer the following comments in the hope that

they will be of assistance to the court and counsel. The circuit court's "damages" instructions included the following instruction regarding how the jury should determine the "present value" of any award for future medical expenses:

> In awarding damages in this case, you must itemize your verdict or award to show the amount intended for: (1) the medical expenses incurred in the past; (2) the medical expenses reasonably probable to be incurred in the future; (3) the loss of earnings and/or earning capacity incurred in the past; (4) the loss of earnings and/or earning capacity reasonably probable to be expected in the future. And again, those will give you little slots on the verdict sheet and medical expenses, there's also related expenses as a part of that item of damage. (5) The non-economic damages sustained in the past and reasonably probable to be sustained in the future. These are all damages which you may find for pain, suffering, inconvenience, physical impairment, other non-pecuniary injury or non-economic damages; and then (6) is any other damages. The [effect] that an injury might have upon a particular person depends upon the susceptibility to injury of the plaintiff. In other words, the fact that the injury would have been less serious if inflicted upon another person should not affect the amount of damages to which the plaintiff may be entitled.

> Now, in this case you have heard about present value qualification. In deciding upon the damages to be awarded for any future economic loss, you shall consider how long the plaintiff is likely to live, notwithstanding the injury, and the present cash value, if any, of the loss. Present cash value means that amount of money needed now which, when added to what that amount may reasonably be expected to earn in the future by prudent investment, will equal the amount of the plaintiff's loss. In other words, the total anticipated future loss must be reduced to an amount which, if prudently invested at a particular rate of interest over the applicable number of years, will return an amount equal to the total anticipated future loss. A plaintiff has a duty to use reasonable efforts to reduce the damages but is not

required to accept the risk of additional loss of injury in these efforts.

Appellant's second post-trial motion included the following request for relief:

4. In the alternative, because the Plaintiff's future medical needs are so uncertain due to his reduced life expectancy and aversion to healthcare, the Defendants move the Court to set up a conservatorship in order to make periodic payments consistent with the future medical needs of the Plaintiff. Maryland statutory law grants the Court the discretion to order that all or part of the jury's future medical damages award to the Plaintiff be placed into a conservatorship to be paid consistent with the needs of the Plaintiff. The conservatorship will be fully funded by the Defendants and their insurers in accordance with Md. C.J.P. § 11–109(c)(1).

5. It makes ample sense for the Court to appoint a conservator to administer payments to the Plaintiff in this case. The conservatorship will safeguard the $355,000 to ensure that the Plaintiff actually receives the funds necessary for future medical treatment. The conservator under this subsection for the Plaintiff will also have the full or final authority to resolve any dispute between the Plaintiff and the Defendants regarding the need or cost of expenses for the Plaintiff's medical, custodial or other care or treatment. Md. C.J.P. § 11–109(c)(3). Moreover, a conservator would also ensure that the jury award will be properly utilized for the Plaintiff's medical care rather than any non-medical related expense. If the Plaintiff actually chooses to treat with specialists and hires a live-in aide, the conservator would properly make those payments. If the Plaintiff chooses not to treat or hire an aide, that amount will remain in the fund set up by the Court. In the event that the Plaintiff dies before his life expectancy, the unpaid balance of the jury award for future medical damages shall revert to the Defendants or their insurer. *See* Md. C.J.P. § 11–109(d).

Appellee's responsive memorandum stated:

Both justifications that the defendants give for forcing a conservator on the plaintiff-that he is allegedly averse to obtaining health care and that he has a markedly reduced life expectancy-are simply wrong on the facts, as discussed above.

Moreover, there is no legal justification in this case for appointment of a conservator pursuant to Md.Code Cts. & Jud. Proc. § 11–109(c)(3). That provision of the code was added by the Maryland Legislature in 1986. In the eighteen years since then, it has never been the subject of any appellate decisions construing its terms as to conservatorship.(footnote omitted). Indeed, to the knowledge of plaintiff's counsel, the conservatorship provision of the statute has never been used by a trial court. There are good reasons for this. Md. Cts. & Jud. Proc. § 11–109(c)(3) contains no guidance for the trial court about such key matters as:

- Who must pay the conservator's fee, and who decides what a reasonable fee is;
- What standards the conservator should use in deciding disputes between the plaintiff and the defendant or defendant's insurer about the necessity of proposed medical care;
- How the conservator should resolve legal disputes such as Mr. Boone's entitlement to payment for gratuitous services provided by family members that are necessarily related to his brain injury.

In short, imposition of a conservator here is neither factually nor legally justified. It would impose a "managed care nightmare" on Mr. Boone, who has been adjudicated the innocent victim of Dr. Goldberg's wrongdoing, and would provide a wholly undeserved potential windfall to Dr. Goldberg and his insurance company should Mr. Boone die before the $355,000 is used up. Inasmuch as the jury's award was an obvious compromise, are the defendants willing to "sweeten the pot" if it turns out Mr. Boone needs more than the jury provided? And if revisiting the award

for purposes of an upward adjustment is not justified, how could it possibly be justified to revisit it for purposes of downscaling it?

According to appellant, (1) the award of damages was excessive because (a) the evidence showed that the appellee will not seek future medical care and (b) appellee would be "reimbursed" for any life care needs because of his girlfriend's voluntary services; (2) the jury improperly assumed that appellee (a) would utilize the compensation package presented, and (b) would live to reach his life expectancy age of approximately 81, despite testimony that he was at risk of stroke and heart attack; and (3) based on the uncertainty of appellee's future medical needs, a conservatorship should be set up to allocate monies consistent with appellee's needs and to otherwise ensure that if appellee does not seek outside care and assistance that the jury's award of future medical damages revert to appellant's insurer.

The General Assembly has provided that "a party filing a motion for a new trial may object to the damages as excessive on the ground that the claimant has been or will be paid, reimbursed, or indemnified to the extent and subject to the limits stated in § 3–2A–05(h) of this subtitle," and that if such an objection has been filed, "[t]he court shall hold a hearing and receive evidence on the objection." Maryland Code, Courts and Judicial Proceedings § 3–2A–06(f). This statute creates exceptions to the rules that when a judgment is entered on a jury verdict that awarded money damages to the plaintiff, although the court has discretion to control the methods by which that judgment is satisfied,[11] (1) the plaintiff is entitled by law to be paid interest on the uncollected portion of the judgment,[12] and (2) the plaintiff's estate is entitled to whatever portion of the judgment, and interest thereon, remain uncollected as of the date of the plaintiff's death.[13] For

---

11. See, e.g., Md. Rules 2–632 and 2–651.

12. See Md.Code, Cts. & Jud. Proc. § 11–107, and Md. Rule 2–604.

13. See Md.Code, Cts. & Jud. Proc. § 11–109(d).

these reasons, the appointment of a conservator constitutes a statutorily authorized remittitur.

The General Assembly has expressly provided that the issue of whether a conservator should be appointed is committed to the sound discretion of the circuit court.[14] While the statute requires a hearing, and while the circuit court has discretion to receive evidence at the hearing, we are persuaded that the circuit court is not required to receive additional evidence on issues resolved by the jury. For these reasons, we conclude that an *evidentiary hearing* is not a condition precedent to a ruling on a motion to appoint a conservator.

According to appellant, the motion for appointment of a conservator cannot be denied until the circuit court has made factual findings on the availability of collateral sources, as well as on "[appellee's] life expectancy and his likelihood of survival to require that care." We are persuaded that the court cannot appoint a conservator without making factual findings sufficient to permit appellate review of the *de facto* remittitur that is the operative effect of an appointment. On the other hand, when—as is the situation in the case at bar—the jury has awarded the "present value" of the plaintiff's future expenses, the court may exercise its sound discretion to deny the motion for a conservator without announcing an on-the-record response to every reason advanced in support of the motion.

### III., V. & VI.

Appellant argues that the circuit court should have sustained his "discovery" and "qualifications" objections to the testimony of Beverley Whitlock, whose testimony was relevant to the issue of damages. The discovery objection is obviously moot, and we are not persuaded that the circuit court erred or abused its wide discretion in overruling appellant's objection to the testimony presented by this witness.

Because arguments about the consequences of a verdict in favor of appellee, to appellant and/or to the community, would

---

14. See Md.Code, Cts. & Jud. Proc. § 11–109(c)(3).

444

have constituted "Golden Rule" arguments prohibited by *Leach v. Metzger,* 241 Md. 533, 536–37, 217 A.2d 302 (1966), the circuit court did not err or abuse its discretion in prohibiting appellant from presenting those arguments.

**JUDGMENT VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR ENTRY OF JUDGMENT IN FAVOR OF APPELLANT ON APPELLEE'S INFORMED CONSENT CLAIM, AND FOR A NEW TRIAL ON THE ISSUE OF DAMAGES TO WHICH APPELLEE IS ENTITLED ON HIS NEGLIGENCE CLAIM; EACH PARTY TO PAY 50% OF THE COSTS.**