912 A.2d 698

**Seth M. GOLDBERG, et al.**

v.

**Billy Karl BOONE.**

**No. 21, Sept. Term, 2006.**

Court of Appeals of Maryland.

Dec. 12, 2006.

98

Albert D. Brault (Bradford J. Roegge, Joan F. Brault, Brault Graham, LLC, on brief), for petitioners/cross-respondents.

Patrick A. Malone (Denis C. Mitchell, Stein, Mitchell & Mezines, on brief), Washington, DC, for respondent/cross-petitioner.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, J.

This case arises out of a medical malpractice action brought by Respondent, Billy Karl Boone, against Petitioners, Seth M. Goldberg, M.D. and Aesthetic Facial Surgery Center of Rockville, Ltd. ("Dr.Goldberg"), for injuries Mr. Boone sustained in the course of undergoing a revisionary mastoidectomy. Dr. Goldberg filed a petition for writ of certiorari, seeking review of a judgment of the Court of Special Appeals and posing the following questions:

1. Whether the failure to grant a mistrial on the grounds that Plaintiff's counsel intentionally introduced improper and inflammatory evidence concerning the recent sniper shootings in Montgomery County entitles the Defendants to a new trial on both liability and damages?

2. Whether the submission to the jury of the issue of lack of informed consent for failure to advise of a more experienced surgeon and breach of the standard of care for the same failure constitutes prejudicial error, warranting a new trial on liability and damages?

3. Was it error not to require proof of causation as to whether a more experienced surgeon would not have caused the same or similar injury? [1]

Mr. Boone also filed a cross-petition presenting two issues:

1. Where a retained expert is asked a single cross-examination question about his prior inconsistent testimony in a highly publicized case, does that question warrant reversal of the denial of a mistrial motion, when the defendants never sought to preclude such questioning in advance, never sought a curative instruction, and did not move for mistrial until a day later, especially when the trial court rejected defense counsel's claims of improper personal attacks and

---

**1.** Because the answer to both question number two, whether the submission to the jury of the issue of informed consent warranted a new trial on liability, and question number three, whether it was error not to require proof of causation as to whether a more experienced surgeon would not have caused the same or similar injury, is dependent upon the interpretation of the doctrine of informed consent, we have collapsed the discussion of the two into one.

commended all counsel for the "highest degree of professionalism" throughout the trial?

2. If this Court considers the request of the defendants to vacate the circuit court's judgment on liability on the negligence count, did the Court of Special Appeals correctly conclude that, as a matter of law, a surgeon with little experience in a complex procedure performed close to the brain had no duty to inform his patient of the abundance of more experienced specialists available?

We granted both petitions. *Goldberg v. Boone*, 393 Md. 242, 900 A.2d 749 (2006). We shall hold that the trial judge did not abuse his discretion in refusing to declare a mistrial or in submitting the informed consent instruction to the jury.

## I. Facts

In 1983, Billy Karl Boone underwent a mastoidectomy[2] to remove a cholesteatomoa[3] from behind his left middle ear. During the procedure, the doctor performing the surgery accidentally drilled a hole into Mr. Boone's skull, exposing the dura.[4] In November of 1999, Mr. Boone was referred by his

---

2. A mastoidectomy is an operation on the mastoid bone, "the prominent bone behind the ear." *American Medical Association Encyclopedia of Medicine* 667 (Charles B. Clayman, M.D., ed., 1989). The mastoid

[p]roject[s] from the temporal bone of the skull . . . it is honeycombed with air cells, which are connected to a cavity in the upper part of the bone called the mastoid antrum. This bone, in turn, is connected to the middle ear. As a result, infections of the middle ear [otitis media] occasionally spread through the mastoid bone to cause acute mastoiditis.

*Id.* A mastoidectomy is a procedure which involves "making an incision behind the ear, opening up the mastoid bone, and removing the infected air cells. The wound is stitched up around a drainage tube, which is removed a day or two later." *Id.* at 667–68.

3. A cholesteatomoa is "[a] rare but serious condition in which skin cells proliferate and debris collects within the middle ear," typically developing as a result of a long-term middle-ear infection. *American Medical Association Encyclopedia of Medicine, supra,* at 274.

4. Dura is short for "dura mater," which is "the tough fibrous membrane that envelops the brain and spinal cord external to the arachnoid

primary care physician to Seth M. Goldberg, M.D., an otolaryngologist,[5] and the sole owner and shareholder of Aesthetic Facial Surgery Center of Rockville, Ltd., due to an ear infection and white, pus-like drainage that Mr. Boone was experiencing in his left ear. Dr. Goldberg determined that Mr. Boone had another cholesteatomoa and that the condition had the potential of being life-threatening. On January 6, 2000, Dr. Goldberg performed an out-patient revisionary mastoidectomy[6] on Mr. Boone to remove the second cholesteatomoa. The day after the procedure, Mr. Boone began experiencing difficulty reading, remembering names, and recalling words. A subsequent MRI scan[7] and a CT scan[8] of Mr. Boone's brain revealed hemorrhaging and an apparent opening in his skull at the cite of the hemorrhaging.

Mr. Boone filed a complaint in the Circuit Court for Montgomery County in December of 2002 against Dr. Goldberg, in which he alleged that Dr. Goldberg had negligently punctured his brain with a surgical instrument during the revisionary mastoidectomy, causing serious and permanent brain damage. Mr. Boone also alleged that Dr. Goldberg failed to inform Mr. Boone that, due to the hole in his dura, the revisionary procedure would be more complex than a standard revisionary mastoidectomy, that there was a risk of sustaining brain damage from the procedure, and that there were more experi-

---

and the pia mater." *Merriam–Webster's Collegiate Dictionary* 388 (11th ed.2005).

**5.** An otolaryngologist is an ear, nose and throat doctor. *Stedman's Medical Dictionary* 1395 (28th ed.2006).

**6.** A "revisionary" mastoidectomoy is a repeated mastoidectomy. *Webster's II New College Dictionary, supra,* at 1067.

**7.** "MRI" is the abbreviation for magnetic resonance imaging. *Stedman's Medical Dictionary, supra,* at 1135.

**8.** "CT" is the abbreviation for a computed tomography, which is "imaging anatomic information from a cross-sectional plane of the body, each image generated by a computer synthesis of x-ray transmission data obtained in many different directions in a given plane." *Stedman's Medical Dictionary, supra,* at 468.

enced surgeons to perform the procedure in the region than Dr. Goldberg, who only had performed one revisionary mastoidectomy in the past three years. In light of these omissions, Mr. Boone requested in his pretrial pleadings that the Maryland Civil Pattern Jury Instruction on informed consent be given, which provides:

a. Informed Consent, Generally:

Before a physician provides medical treatment to a patient, the physician is required to explain the treatment to the patient and to warn of any material risk or dangers of the treatment, so that the patient can make an intelligent and informed decision about whether or not to go forward with the proposed treatment. This is known as the doctrine of informed consent.

In fulfilling the duty to disclose, the physician is required to reveal to the patient the nature of the ailment, the nature of the proposed treatment, the probability of success of the proposed treatment and any alternatives, and the material risks of unfortunate outcomes associated with such treatment.

A "material risk" is defined as "a risk which a physician knows or ought to know would be significant to a reasonable person in the patient's position in deciding whether or not to have the particular medical treatment or procedure."

The physician's duty to disclose material risks to the patient is based upon an objective standard rather than a subjective standard. This means that the question of whether a risk is a "material risk" is based upon whether a reasonable person in the position of the patient would have considered the risk to be a material risk. Whether the patient would have consented to the procedure, if informed of the risk, is a relevant factor to be considered, but is not conclusive.

The physician is not required to divulge all risks, but only those which are material to the intelligent decision of a reasonably prudent patient.

b. Informed Consent (Limitations on Duty to Disclose):

The physician has a qualified privilege to withhold information on therapeutic grounds, as in those cases where a complete and candid disclosure of possible alternatives and consequences more likely than not might have a detrimental effect on the physical or psychological well-being of the patient, or where the patient is incapable of giving his or her consent by reason of mental disability or infancy, or has specifically requested that he or she not be told.

Maryland Civil Pattern Jury Instruction 27: 4 (2006).

During the trial, Mr. Boone put on several medical experts who testified that Dr. Goldberg should have disclosed that the revisionary mastoidectomy posed a risk of brain damage, and also that it would have been prudent for Dr. Goldberg to have referred Mr. Boone to a surgeon more experienced in performing such a revisionary mastoidectomy as complex as Mr. Boone's.

Dr. Goldberg also put on several medical experts, one of whom was Dr. David Schretlen, a neuropsychologist [9] who had performed extensive neuropsychological examinations of Mr. Boone. On cross-examination of Dr. Schretlen the following dialogue occurred:

[COUNSEL FOR MR. BOONE]: Now, other people who have talked with Mr. Boone or talked about Mr. Boone or given therapy to Mr. Boone have talked about him not being aware, not having full insight into the degree of the anger that he has or the anger that he expresses. Wouldn't you agree that is fairly common in these kinds of patients, that they are not fully, they don't have full insight into all of their problems?

SCHRETLEN: I wouldn't say that. I mean, it happens, but I'm not, (a) I'm not sure that's the case in this case at

9. A neuropsychologist is a doctor of neuropsychology, "[a] specialty of psychology concerned with the study of the relationships between the brain and behavior, including the use of psychological tests and assessment techniques to diagnose specific cognitive and behavioral deficits and to prescribe rehabilitation strategies for their remediation." *Stedman's Medical Dictionary, supra,* at 1314.

all, and (b) it certainly is, yeah, it's common, but it's also commonly not the case—

\* \* \*

[COUNSEL FOR MR. BOONE]: Okay. I mean, you are hired here basically as a minimizer, aren't you?

[COUNSEL FOR DR. GOLDBERG]: Objection, Your Honor.

THE COURT: Overruled.

\* \* \*

[COUNSEL FOR MR. BOONE]: Okay. Now, the very last case you testified, you testified against my client, Sharon Burke. You said she had a mild problem, too. Do you remember that?

\* \* \*

[COUNSEL FOR MR. BOONE]: She flunked 55 out of 60 tests you gave her and still you called it a "mild" problem. Don't you recall that?

SCHRETLEN: I recall that I diagnosed her with dementia, [Counsel for Mr. Boone].

[COUNSEL FOR MR. BOONE]: Sir, don't you remember you used the word "mild" in your courtroom testimony?

\* \* \*

SCHRETLEN: I said it was milder than some, as you may recall, but that she had a moderately severe dementia syndrome.

\* \* \*

[COUNSEL FOR MR. BOONE]: Now, the case before that, that you testified in court, was a criminal case, right?

SCHRETLEN: I'm not sure.

[COUNSEL FOR MR. BOONE]: Okay. Well, you testified a young man, about 18 years old, and you did a daylong battery of tests on him and he tested abnormal in one or two tests, right?

SCHRETLEN: Oh, yes. I know who you are speaking of.

[COUNSEL FOR MR. BOONE]: Okay. He was only abnormal in one or two tests?

SCHRETLEN: That's right.

[COUNSEL FOR MR. BOONE]: Okay. And that young man, you were willing to come into court and testify that he might have been brainwashed into murdering 10 people in the sniper thing, isn't that true?

[COUNSEL FOR DR. GOLDBERG]: Objection, Your Honor.

SCHRETLEN: That is absolutely incorrect and outrageous.

THE COURT: Sustained.

[COUNSEL FOR MR. BOONE]: Well, let's talk about it for a minute.

SCHRETLEN: Yes.

[COUNSEL FOR MR. BOONE]: The young man's name—

[COUNSEL FOR DR. GOLDBERG]: May we approach, Your Honor?

\* \* \*

This is an outrage. I am not getting into the sniper syndrome, and I don't have the records and I don't have— and it has no relevance to this case. And this is only the kind of cross-examination that I heard once before in my career and that came from Marvin Ellin in a case, and I objected to it then and I do now. We don't know anything about these other cases.

[COUNSEL FOR MR. BOONE]: I tried to lay a fairly careful foundation before I asked him the question, which is that he testified he tested a young man over a period of eight hours, and this young man he tested only tested abnormal on one or two of the tests he gave him, and yet he was willing to come into court and testify on his behalf. Maybe I phrased it wrong on the ultimate outcome, but he is one of the star witnesses for the defense on this issue of whether or not he had some dissociative disorder.

The point is that he will minimize on one side or maximize on the other side. That is the point I am trying to make here. I think it is absolutely fair.

THE COURT: All right. I am not going to allow you to get into this area. Objection sustained.

[COUNSEL FOR DR. GOLDBERG]: All right.

The next day, before the jury entered the courtroom, counsel for Dr. Goldberg requested that the judge declare a mistrial, stating:

[COUNSEL FOR DR. GOLDBERG]: I've been very concerned about cross-examination of Dr. Schretlen that's highly inflammatory and this is a hearsay issue, and counsel . . . in a calculated questioning brought out in his questioning that it was the sniper case he found that the defendant was brainwashed in which it was anyone who ever lived in this area knows what that is and that's Lee Malvo. It was on the front page of every paper in this area. The killings occurred near this courthouse. Everybody is involved and it was calculated to prejudice the Defense, even though after he had gotten the question out, the Court sustained the objection. My first concern the damage had been done and accordingly, I respectfully move for a mistrial.

The judge then listened to argument from counsel for Mr. Boone as to his rationale for the questions:

[COUNSEL FOR MR. BOONE]: My intent was to bring out, and I have brought out previously that, I was trying to impeach his credibility on being a minimizer or a maximizer, as the case may call for, and in that case, the point was, and it was the most recent trial that he testified in before my other trial. It was right on his list and if they had any problem with me getting into it, they certainly could have mentioned it, but my point was that he testified—

THE COURT: Well, they did. They objected.

[COUNSEL FOR MR. BOONE]: No, but I mean, I mean, ahead of time because it was right on this list of, that [Counsel for Dr. Goldberg] gave me a list of the man's testimonial appearances before he appeared and it was very

prominent on the list. So my point was that he did an eight hour test on this other guy, found only one abnormal test in the entire eight hours and still was willing to come into court and testify as he did, and I thought that was quite a legitimate contrast to, you know, coming into court and saying that somebody else who has several abnormal test results is hardly damaging at all, and I agree, it's, that's why I was trying to avoid the name of the case. . . .

The judge ultimately denied the motion for a mistrial, stating:

THE COURT: I think the purpose was clear or the inference was clear that [Counsel for Mr. Boone] was trying to suggest that he was called regularly as a minimizer initially by your office and then when he went to the Malvo case, that essentially he's a hired gun, and then I think that was the purpose that he would, at least that's what I took, that he was trying to show that he would testify essentially for whoever hired him, whoever paid him.

\* \* \*

THE COURT: And I don't think it rises to the level of a mistrial. So I'm going to deny the motion for a mistrial.

At the close of all evidence, counsel for Dr. Goldberg requested that the judge not submit the instruction on the doctrine of informed consent to the jury because Mr. Boone had failed to establish proximate cause. Dr. Goldberg argued that Mr. Boone had failed to put on any evidence establishing that, had the specific data that Mr. Boone complained of been disclosed by Dr. Goldberg, Mr. Boone would have chosen not to have had the operation or, alternatively, that had Mr. Boone gone to a more experienced surgeon, he would have, more likely than not, experienced better results. The judge denied Dr. Goldberg's motion, explaining:

THE COURT: I think that what [Mr. Boone is] saying is that, and I guess this is where I'm having trouble is, what [Mr. Boone is] saying is if, in fact, he had been informed correctly, he would have had the option to go somewhere else for treatment from somebody who would not have done this or who would have increased his chances. I mean

that's what—I guess you're going to have to—they're saying that the adequate disclosure would have reasonably been expected to have caused this person to decline the treatment with this doctor.

[COUNSEL FOR DR. GOLDBERG]: And go somewhere else?

THE COURT: And go somewhere else.

[COUNSEL FOR DR. GOLDBERG]: But what would happen somewhere else?

THE COURT: Well, that's a good question. It would lessen his chance. That's essentially what their expert said but I think that's the issue and I think, under all the facts of the case, it's probably appropriate to let the jury consider it. . . .

The judge then gave the following jury instructions:

Now there's also the issue, ladies and gentleman, of informed consent in this case. And in connection with that I tell you before providing a specific type or course of medical treatment to a mentally competent adult patient under non-emergency circumstances, a physician has a duty to obtain the consent of the patient after disclosing to the patient:

(1) the nature of the condition to be treated; (2) the nature of the treatment being proposed; (3) the probability of success of that treatment; (4) the alternatives, if any, to the proposed treatment; and (5) every material risk of negative consequences of the treatment being proposed.

A material risk is a risk that a physician knows, or ought to know, would be significant to a reasonable person who is being asked to decide whether to consent to a particular medical treatment or procedure. The purpose of the required explanation is to enable the patient to make an intelligent and informed choice about whether to undergo the treatment being proposed. A physician is liable for an injury caused by the physician's failure to disclose to the patient, a material risk.

Counsel for Dr. Goldberg then iterated his exception to the informed consent instruction. The jury also was presented with a special verdict sheet including the following questions:

1. Do you find that the defendant, Seth M. Goldberg, M.D., breached the standard of care in his performance of a radical mastoidectomy performed upon Billy K. Boone, Sr.?

_____ Yes _____ No

2. If your answer to Question No. 1 is "No", then go to Question No. 3. If your answer to Question No. 1 is "Yes", do you find that the breach in the standard of care was a proximate cause of the Plaintiff's injuries?

_____ Yes _____ No

3. Do you find that the Defendant, Seth M. Goldberg, M.D., failed to adequately advise the Plaintiff of the risks of his radical mastoidectomy procedure? If your Answer to Question No. 3 is "Yes", then go to Question No. 4.

_____ Yes _____ No

4. If your answer to Question No. 3 is "Yes", do you find that the failure to adequately advise the Plaintiff of the risks of the radical mastoidectomy was a proximate cause of the Plaintiff's injuries?

_____ Yes _____ No.

5. If your answer to Question No. 2 or No. 4 is "Yes", what amounts of damage do you award?

Past and Future Earning Capacity

$ _____

Past and Future Medical and Related Expenses

$ _____

Non–Economic Damages

$ _____

After deliberating for two days, the jury answered "Yes" to questions one through four and awarded Mr. Boone $113,000 for loss of past and future earning capacity, $355,000 for past and future medical expenses and $475,000 for non-economic damages, for a total award of $943,000. Dr. Goldberg subse-

quently filed a motion for judgment notwithstanding the verdict, or in the alternative, motion for a new trial, as well as a motion for a new trial on the issue of future medical damages or in the alternative, a motion for appointment of a conservator, all of which were denied.

Dr. Goldberg noted a timely appeal to the Court of Special Appeals arguing that the informed consent instruction should not have been given to the jury and that the trial judge abused his discretion in refusing to grant a mistrial in light of counsel for Mr. Boone's inflammatory questions of Dr. Schretlen, in which he attempted to portray him as a "minimizer" and alleging in one question that Dr. Schretlen had been willing to testify that one of the alleged "sniper" killers had been brainwashed.[10] In a reported opinion, the intermediate appellate court held that a surgeon does not have a duty to advise a patient that there are more experienced physicians in the locality to perform an operation, and therefore the trial judge erred in submitting the informed consent question to the jury.

---

**10.** Dr. Goldberg submitted seven questions to the Court of Special Appeals:

 1. Whether the trial court erred in submitting to the jury the issue of informed consent in the absence of evidence of proximate cause?

 2. Whether the trial court erred in submitting to the jury the issue of whether the failure to advise [Mr. Boone] of the availability of a specialist violated the standard of care, in the absence of evidence of proximate cause?

 3. Whether the trial court erred in allowing Beverly Whitlock to testify at trial when she was not disclosed as a potential expert witness as required by the trial court's scheduling order?

 4. Whether the trial court erred in denying [Dr. Goldberg's] motion for mistrial on the grounds that [Mr. Boone's] counsel intentionally introduced improper and inflammatory evidence concerning the recent sniper shooting, coupled with a claim that the Defense experts were hired as "paid minimizers"?

 5. Whether the trial court erred in precluding evidence and argument that a verdict for Mr. Boone would have an impact on Dr. Goldberg's reputation and career?

 6. Whether the trial court erred in precluding evidence and argument concerning the common good?

 7. Whether the trial court abused its discretion in failing to grant Dr. Goldberg's post-trial motions or at least to give them adequate consideration?

*Goldberg v. Boone,* 167 Md.App. 410, 416, 893 A.2d 625, 628 (2006).

*Goldberg,* 167 Md.App. at 425, 893 A.2d at 633. The appellate court held, however, that, in light of the jury's finding that Dr. Goldberg had negligently performed the mastoidectomy, and the fact that there was sufficient evidence presented regarding Dr. Goldberg's relative lack of experience performing revisionary mastoidectomies to warrant that finding, the erroneous informed consent instruction did not constitute prejudicial error and did not warrant a new trial on the negligence claim. *Id.* at 427, 893 A.2d at 634. The intermediate appellate court also concluded that, although Mr. Boone's counsel had the ability to question Dr. Schretlen about being a paid "minimizer," he had no right to refer to the sniper shootings, and that question so unfairly prejudiced Dr. Goldberg as to warrant a new trial on the issue of damages because Dr. Schretlen only had testified for the purpose of establishing damages.[11] *Id.* at 438, 893 A.2d at 641. Thus, the Court of Special Appeals held that the trial judge's failure to declare a mistrial in light of those questions constituted an abuse of his discretion. The Court of Special Appeals vacated the circuit court's judgment and remanded the case to the circuit court for entry of judgment in favor of Dr. Goldberg on the informed consent claim, and for a new trial on the issue of damages resulting from Dr. Goldberg's negligence. *Id.* at 444, 893 A.2d at 645.

Before this Court, Dr. Goldberg contends that the Court of Special Appeals was correct in holding that the prejudice caused by Mr. Boone's sniper question during the cross-examination of Dr. Schretlen was so great as to warrant the granting of a new trial, but that the intermediate appellate court erred in holding that the question regarding being a paid "minimizer" was proper and in granting the new trial solely on the issue of damages. Dr. Goldberg maintains that a partial retrial is an inappropriate remedy in this case because the issue of damages cannot be isolated from the issue of negligence, because the verdict rendered on all issues in this

---

11. Because we shall hold that Mr. Boone's counsel's questions regarding one of the snipers was not so prejudicial as to warrant the grant of a mistrial, we will not reach the issue of whether the Court of Special Appeals correctly granted a partial retrial on the one issue of damages.

case was clearly the result of the prejudice caused by the unfair tactic of referring to Dr. Schretlen's work for one of the snipers, and because the level of prejudice caused by the sniper questions transcended any curative measures taken by the trial judge. Therefore, Dr. Goldberg maintains that the only fair and proper remedy is a full retrial on the issues of negligence and damages.

With regard to the informed consent jury instruction, Dr. Goldberg argues that, although the Court of Special Appeals was correct in holding that there is no duty in Maryland requiring a physician to inform his or her patients that there are more experienced surgeons in the locality regarding the procedure in question, the court erred in determining that the submission of the instruction to the jury was nonprejudicial. The submission of the erroneous instruction to the jury constituted prejudicial error, Dr. Goldberg maintains, because Mr. Boone intermingled his arguments and evidence regarding informed consent with his arguments and evidence regarding negligence. Therefore, he submits, there exists a substantial danger that the jury confused the duty to properly inform Mr. Boone with the duty to provide adequate care in rendering its verdict. Moreover, Dr. Goldberg also asserts that it is impossible to tell from the verdict sheet what damages were awarded for what claims, and therefore some of the damages awarded to Mr. Boone may have been awarded under the erroneously submitted informed consent claim.

Alternatively, Dr. Goldberg contends, that even if the Court of Special Appeals was incorrect in holding that no such duty exists, the trial judge still erred in submitting the instruction to the jury because what Mr. Boone is really asserting is a loss of chance of a better result claim, which required that Mr. Boone demonstrate that, had another, more experienced surgeon performed the revisionary mastoidectomy, Mr. Boone would have more likely than not, experienced better results. Dr. Goldberg argues that Mr. Boone failed to establish that causation.

Conversely, Mr. Boone contends that the Court of Special Appeals erred in holding that the cross-examination questioning of Dr. Schretlen warranted a new trial on damages because, without a motion in limine to prevent the line of questioning, an expert witness may be questioned regarding income derived from testifying as an expert witness and the professional opinions that the witness previously has rendered. Mr. Boone also claims that, based upon a weighing of the pervasiveness, severity, and centrality of the prejudice, as well as the steps taken to mitigate the prejudice and the closeness of the case, no new trial was warranted. Mr. Boone further alleges that, because the sniper comments were not in anyway related to the defendant or the defendant's prior bad acts, the Court of Special Appeals's effectively granting of a new trial is inconsistent with this Court's jurisprudence regarding abuse of discretion in failing to declare a mistrial or, alternatively, failing to grant a new trial.

Mr. Boone also maintains that the Court of Special Appeals erred in reaching the informed consent jury instruction because, where there are independent grounds to sustain a jury verdict, the verdict should not be disturbed, and there was sufficient evidence to sustain the verdict on negligence. He contends that, contrary to Dr. Goldberg's assertions, there is no danger that the jury confused the issue of negligence with that of informed consent because the jury verdict form clearly separated the two issues, and the form was thoroughly explained to the jury. Moreover, Mr. Boone alleges that, no matter which claim he succeeded on, the damages awarded would have been the same. He also argues that the Court of Special Appeals erred in reaching the duty issue because Dr. Goldberg objected to the informed consent instruction on the ground that Mr. Boone had failed to prove causation, not on the ground that the duty did not exist, and, as such, the issue of whether a duty existed was not properly preserved.

Mr. Boone further claims that, in holding that a doctor is not required to inform his or her patient that there are more experienced physicians in the locality, the Court of Special Appeals erred by making a determination that is required to

be made by the jury. He submits that the doctrine of informed consent requires that the jury determine whether certain information would be material to a reasonable person deciding whether to undergo the procedure such that the doctor would be required to disclose that information.

Finally, Mr. Boone contends that the trial judge correctly denied Dr. Goldberg's motion for judgment notwithstanding the verdict for failure to prove causation because Mr. Boone was not required to testify that, had he been properly informed, he would not have chosen to have the procedure performed by Dr. Goldberg. Mr. Boone maintains that he only was required to demonstrate that a reasonable person would not have chosen to have Dr. Goldberg perform the operation and that through his expert witnesses he put on sufficient evidence for the jury to draw that conclusion.

## II. Discussion

### A. Motion for Mistrial

The first issue that we must address in this case is whether the cross-examination questions propounded by Mr. Boone's counsel of one of Dr. Goldberg's experts regarding minimization when testifying for the defense in civil litigation, and one of the "snipers" when testifying on behalf of a defendant in a criminal case, were so prejudicial as to warrant the grant of a mistrial.

Because the decision of whether to grant a mistrial lies within the sound discretion of the trial judge, we will only disturb its denial if we find that there was an abuse of that discretion. *Lai v. Sagle,* 373 Md. 306, 316–17, 818 A.2d 237, 244 (2003), quoting *Med. Mut. Liab. Ins. Soc'y of Md. v. Evans,* 330 Md. 1, 19, 622 A.2d 103, 112 (1993); *Owens–Corning Fiberglas Corp. v. Garrett,* 343 Md. 500, 517, 682 A.2d 1143, 1151 (1996); *ACandS, Inc. v. Godwin,* 340 Md. 334, 407, 667 A.2d 116, 151 (1995); *Buck v. Cam's Broadloom Rugs, Inc.,* 328 Md. 51, 57, 612 A.2d 1294, 1297 (1992). To that extent,

improper or prejudicial statements, remarks or arguments of counsel generally are cured by reproof by the trial judge; to his discretion customarily is left the choice of methods to protect the fair and unprejudiced workings of the judicial proceedings and his decision as to the effect of that choice upon the jury and only in the exceptional case, the blatant case, will his choice of cure and his decision as to its effect be reversed on appeal.

*DeMay v. Carper,* 247 Md. 535, 540, 233 A.2d 765–768 (1967). *See also Brooks v. Daley,* 242 Md. 185, 197–98, 218 A.2d 184, 190–91 (1966); *Nelson v. Seiler,* 154 Md. 63, 72–73, 139 A. 564, 567–68 (1927). Whether a "blatant case" exists to warrant a finding of abuse of discretion requires us to make two determinations: first, whether the moving party was prejudiced by the opposing party's conduct, comments or evidence; and second, whether the trial judge took sufficient curative measures to overcome that prejudice, or, whether the prejudice was so great that, in spite of the curative measures, the moving party was denied a fair trial. *See Tierco Md., Inc. v. Williams,* 381 Md. 378, 413–14, 849 A.2d 504, 525–26 (2004); *Owens–Corning Fiberglas Corp.,* 343 Md. at 518–19, 682 A.2d at 1151–52; *Evans,* 330 Md. at 19, 622 A.2d at 112, citing *Rainville v. State,* 328 Md. 398, 408, 614 A.2d 949, 953–54 (1992); *ACandS, Inc.,* 340 Md. at 407, 667 A.2d at 151–52. In this case, the Court of Special Appeals correctly held that Mr. Boone's counsel's paid "minimizer" question during the cross-examination of Dr. Schretlen was not prejudicial but erred in holding that the question regarding one of the snipers was so prejudicial to the proceeding that it transcended any curative measures taken by the trial judge and, therefore, warranted a retrial on damages.

Cross-examination of a witness is governed by Maryland Rules of Civil Procedure, Rule 5–611, which provides in pertinent part:

(a) **Control by Court.** The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the

truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

**(b) Scope of cross-examination.** (1) Except as provided in subsection (b)(2), cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. Except for the cross-examination of an accused who testifies on a preliminary matter, the court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

(2) An accused who testifies on a non-preliminary matter may be cross-examined on any matter relevant to any issue in the action.

Maryland Rule 5–611(a) & (b). Rule 5–616(a)(4) also provides that the credibility of a witness may be attacked on cross-examination through questions directed at "[p]roving that the witness is biased, prejudiced, interested in the outcome of the proceeding, or has a motive to testify falsely." Maryland Rule 5–616(a)(4).

■ It is well established in Maryland that an expert witness may be questioned on cross-examination about compensation received for testifying, as well as about the expert's history of employment as an expert witness, in order to reveal bias or interest in the outcome of the proceeding. As early as 1892, in *Wise v. Ackerman,* 76 Md. 375, 25 A. 424 (1892), we held that the trial judge had abused his discretion in sustaining objections to questions regarding comments the plaintiff's expert witness had made in an unrelated case regarding his ability to get large verdicts for plaintiffs. *Id.* at 393–94, 25 A. at 427. We explicated that questions revealing an expert witness's interests, motives, inclinations and prejudices are appropriate lines of questioning on cross-examination of an expert witness. *Id.* at 394, 25 A. at 427. In *Mezzanotte Construction Co. v. Gibons,* 219 Md. 178, 148 A.2d 399 (1959), we held that the trial judge had abused his discretion in sustaining an objection to questions regarding how much money the plaintiff's expert witness was being paid for testify-

ing in that case and from prohibiting any further questioning into the expert witness's compensation; in so holding, we noted that "the compensation of an expert witness is a proper subject for cross-examination," because it reveals the expert witness's interest in the case, "which might be deemed to affect his credibility or bias." *Id.* at 181, 148 A.2d at 401–02.

In *Wrobleski v. Lara*, 353 Md. 509, 727 A.2d 930 (1999), counsel for the defendant attacked the veracity of the plaintiff's expert witnesses through questioning that revealed that the expert had testified 50 to 60 times for medical malpractice plaintiffs, that about 25 of those times had been for the clients of the plaintiff's attorney, that 80% of his appearances were on behalf of plaintiffs, and that, in the preceding twelve months, he had earned between $30,000 and $50,000 through testifying, most of which was for the plaintiff's attorney. We upheld the judge's decision to permit testimony regarding the total amount of compensation the expert witness had received from testifying as a witness in the previous year because the question sought to expose the witness's potential bias; we iterated that questions regarding how much an expert witness is being paid for his or her services in a particular case, the frequency with which the witness testifies in similar kinds of cases, whether the witness customarily testified on behalf of plaintiffs or defendants, whether the witness is frequently employed by a particular party or attorney and, if so, how much income the witness derives from that employment, and the amount or percentage of the witness's total income that is derived from lawyer referrals or testimony in lawsuits, also are appropriate queries to expose an expert witness's bias. *Id.* at 517–18, 727 A.2d at 933–34.

■ In the case *sub judice*, the paid "minimizer" question asked by Mr. Boone's counsel was asked for the purpose of suggesting that Dr. Schretlen might testify in accordance with the position of the person by whom he was being paid. The question, therefore, comes within the penumbra of allowable questions that this Court heretofore has deemed appropriate. *See id.* at 518, 727 A.2d at 934 ("That an expert in a particular

field may be in effect a 'professional witness' in lawsuits, rather than being more or less exclusively a practitioner whose employment in a lawsuit as a witness is merely incidental to his or her profession, is a matter which is likely to bear on the credibility of that expert, since a significant portion of the expert's livelihood may thus depend on his or her desirability as a favorable and convincing witness, thus possibly leading to a temptation for the witness to color findings and testimony to suit the needs of the proponent party, rather than to evaluate and present the subject matter of the testimony with complete impartiality."), quoting Russell G. Donaldson, Annotation, *Propriety of Cross–Examining Expert Witness Regarding His Status as "Professional Witness,"* 39 A.L.R.4th 742, 746 (1985).

Dr. Goldberg also asserts, nevertheless, that the sniper line of questioning generated a prejudice as pervasive as those explored in *Medical Mutual Liability Insurance Society of Maryland v. Evans, supra, Lai v. Sagle, supra,* and *Tierco Maryland, Inc. v. Williams, supra.*[12] In those cases, however, the objectionable questions or comments referred either to inadmissable evidence or were repeatedly interjected into the proceedings, obscuring the issues on trial. In *Evans, supra,* an action for bad-faith failure to settle a medical malpractice action, counsel for the plaintiff questioned the defendant's witness on cross-examination regarding a previous lawsuit against the defendant for a bad-faith failure to settle in which the jury had awarded the plaintiff $1,400,000. We explicated that the questioning into the defendant's prior bad acts was improper and irrelevant, serving only to "obscure the real

---

12. Dr. Goldberg cites *Buck, supra,* in support of his argument that the question asked by Mr. Boone's counsel regarding being a paid "minimizer" was so prejudicial to the proceeding as to warrant a new trial. He, however, misinterprets our holding in *Buck,* which stands for the proposition that the Court of Special Appeals erred in substituting its judgment for that of the trial judge. We held in *Buck* that the trial judge did not abuse his discretion in granting a new trial because the verdict was "unmeasurably low" in part, because of a "pattern ... of [mis]conduct, rather than an isolated instance of misconduct," contributed to a lower damages award. 328 Md. at 62, 612 A.2d at 1300.

issue," and emphasized that "[e]ven the most intense and dedicated advocate would recognize the likely inadmissibility of, and the potential for a mistrial caused by a reference to, an allegedly bad faith failure to settle in a collateral matter." *Evans*, 330 Md. at 22, 24, 622 A.2d at 113–14. We also observed that the plaintiff's counsel had played upon and emphasized other improper and collateral matters throughout the trial. *Id.* at 22, 622 A.2d at 113. We therefore held that, "[u]nder all of the circumstances ... the prejudice resulting from the improper cross-examination of [the defendant's witness] transcended the curative instruction, and that the trial court abused its discretion in denying the motion for a mistrial." *Id.* at 24, 622 A.2d at 114.

In *Lai*, *supra*, another medical malpractice lawsuit, the plaintiff's counsel mentioned in his opening statement that the defendant doctor had been sued five times for malpractice. Iterating that relevancy is the gravamen of whether a comment or question was prejudicial to the opposing party, we noted that the reference to the doctor's other five malpractice lawsuits had no probative value and therefore was prejudicial. *Lai*, 373 Md. at 322, 818 A.2d at 247. Analogizing the admission of similar acts in civil cases to the admission of evidence of prior arrests in criminal trials, we held that such evidence was "unduly and highly prejudicial and ordinarily shall result, upon proper objection and motion, in a mistrial," and that "[n]o curative instruction or instructions of which we can conceive, and certainly not as given in this case, is sufficient to undo the taint inflicted upon the proceedings by such conduct or occurrence." *Id.* at 324–25, 818 A.2d at 248–49.

In *Tierco Maryland, Inc.*, *supra*, the plaintiff's counsel referred to race or discrimination at least sixty-three times during a three day trial even though the plaintiffs had not alleged racial discrimination in their cause of action. We emphasized that the test for determining whether improper comments were prejudicial to the fairness of proceedings is whether they were " 'irrelevant and unjustified and calculated or tending to arouse racial, national, or religious prejudice or

feeling'." *Tierco Md., Inc.,* 381 Md. at 409–10, 849 A.2d at 523. We concluded that "[the plaintiffs] employed race overtly to overwhelm the material issues of provocation and of the reasonableness *vel non* of the actions of the [defendants's] employees," and therefore it was an abuse of discretion for the trial judge not to have granted the defendants's request for a new trial. *Id.* at 411, 414, 849 A.2d at 524, 526.

In the case at bar, although the reference to one the "snipers" in Mr. Boone's counsel's question clearly could have created an atmosphere of disgust on the part of the jury for Dr. Schretlen's willingness to testify thusly in the sniper case, it was asked only once of the expert and was never mentioned again. Further, when counsel for Dr. Goldberg objected to the line of questioning involving Dr. Schretlen's testimony on behalf one of the "snipers," the trial judge sustained the objection, and the questioning ended.

In so holding, however, we do not condone counsel's conduct in asking questions about a "sniper" in a county where many of the killings occurred, questions which could be construed as nothing more than an appeal to the jurors' passions and prejudices. Because the line of questioning about the sniper case, although improper, was appropriately truncated by the trial court's sustaining of the objection, and because it played so minor a role in the trial, its prejudicial effects did not transcend the trial judge's curative measures so as to warrant a new trial.

## B. Informed Consent

■ The next issue we must address is the propriety of the trial court's jury instruction on informed consent. In this case, the trial court gave the following informed consent instruction:

> Now there's also the issue, ladies and gentleman, of informed consent in this case. And in connection with that I tell you before providing a specific type or course of medical treatment to a mentally competent adult patient under non-

emergency circumstances, a physician has a duty to obtain the consent of the patient after disclosing to the patient: (1) the nature of the condition to be treated; (2) the nature of the treatment being proposed; (3) the probability of success of that treatment; (4) the alternatives, if any, to the proposed treatment; and (5) every material risk of negative consequences of the treatment being proposed.

A material risk is a risk that a physician knows, or ought to know, would be significant to a reasonable person who is being asked to decide whether to consent to a particular medical treatment or procedure. The purpose of the required explanation is to enable the patient to make an intelligent and informed choice about whether to undergo the treatment being proposed. A physician is liable for an injury caused by the physician's failure to disclose to the patient, a material risk.

Dr. Goldberg contends that the instruction was unjustified because, as the Court of Special Appeals held, there is no recognized duty in Maryland to inform a surgical patient that there are more experienced surgeons in that particular procedure and, even if there were such a duty, Mr. Boone failed to put on evidence demonstrating causation. This contention is without merit because it was not an abuse of discretion for the trial judge to give an informed consent instruction when its content was a correct exposition of the law and there was testimony in the case to generate a triable issue.

The procedure for submission of jury instructions is governed by Maryland Rules of Civil Procedure, Rule 2–520, which provides in pertinent part:

(a) **When given.** The court shall give instructions to the jury at the conclusion of all the evidence and before closing arguments and may supplement them at a later time when appropriate. In its discretion, the court may also give opening and interim instructions.

(b) **Written requests.** The parties may file written requests for instructions at or before the close of the evidence and shall do so at any time fixed by the court.

(c) **How given.** The court may instruct the jury, orally or in writing or both, by granting requested instructions, by giving instructions of its own, or by combining any of these methods. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given. Maryland Rule 2–520.

 We have recognized that a litigant is entitled to have his instruction submitted to the jury if the instruction "is a correct exposition of the law and there is testimony in the case which supports it." *See Landon v. Zorn,* 389 Md. 206, 225, 884 A.2d 142, 153 (2005); *Benik v. Hatcher,* 358 Md. 507, 519, 750 A.2d 10, 17 (2000); *Kennelly v. Burgess,* 337 Md. 562, 574, 654 A.2d 1335, 1341 (1995); *Sergeant Co. v. Pickett,* 285 Md. 186, 194, 401 A.2d 651, 655 (1979); *Levine v. Rendler,* 272 Md. 1, 13, 320 A.2d 258, 265 (1974). Thus, inquiry into whether a jury instruction was appropriately given requires that we determine whether the instruction correctly stated the law, and if so, whether the law was applicable in light of the evidence before the jury. *Landon,* 389 Md. at 224, 884 A.2d at 153, quoting *Wegad v. Howard St. Jewelers, Inc.,* 326 Md. 409, 414, 605 A.2d 123, 126 (1992); *Holman v. Kelly Catering, Inc.,* 334 Md. 480, 495–96, 639 A.2d 701, 709 (1994). When the jury instruction given "clearly set[s] forth the applicable law, there is no reversible error." *Benik,* 358 Md. at 519, 750 A.2d at 17, quoting *CSX Transp., Inc. v. Cont'l Ins. Co.,* 343 Md. 216, 240, 680 A.2d 1082, 1094 (1996).

 The seminal case on the doctrine of informed consent in Maryland is *Sard v. Hardy,* 281 Md. 432, 379 A.2d 1014 (1977), the first case in which we acknowledged an action could lie for failure of a physician to obtain a patient's informed consent before rendering medical services. We explained in *Sard* that "[t]he fountainhead of the doctrine of informed consent is the patient's right to exercise control over his own body." *Id.* at 439, 379 A.2d at 1019. The doctrine, "simply stated,"

imposes on a physician, before he subjects his patient to medical treatment, the duty to explain the procedure to the

patient and to warn him of any material risks or dangers inherent in or collateral to the therapy, so as to enable the patient to make an intelligent and informed choice about whether or not to undergo such treatment.

*Id.* at 439, 379 A.2d at 1020. We noted, however, that there is no bright-line test for determining the scope of disclosure required. *Id.* at 444, 379 A.2d at 1022. Instead, the measure of disclosure is dependent upon each patient's need, " 'and that need is whatever is material to the decision' " of whether to undergo the treatment. *Id.* at 443, 379 A.2d at 1022, quoting *Cobbs v. Grant,* 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1, 11 (1972). Thus, we stated, "the test for determining whether a potential peril must be divulged is its materiality to the patient's decision." *Id.* at 443–44, 379 A.2d at 1022, quoting *Cobbs,* 104 Cal.Rptr. 505, 502 P.2d at 11.

By focusing on the patient's need to obtain information pertinent to the proposed surgery or therapy, the materiality test promotes the paramount purpose of the informed consent doctrine—to vindicate the patient's right to determine what shall be done with his own body and when.

*Id.* at 444, 379 A.2d at 1022. We defined a material risk as one which a physician knows or ought to know would be significant to a reasonable person in the patient's position in deciding whether or not to submit to a particular medical treatment or procedure.

*Id.* We further elucidated that the plaintiff must demonstrate a causal connection between the lack of informed consent and the plaintiff's damages. *Id.* at 448, 379 A.2d at 1024. We adopted an objective standard for determining whether causality had been demonstrated, requiring the jury to determine whether a reasonable person in the patient's position would have withheld consent to the surgery or therapy had all material risks been disclosed. If disclosure of all material risks would not have changed the decision of a reasonable person in the position of the patient, there is no causal connection between nondisclosure and his damage. If, however, disclosure of all material risks would have caused a

reasonable person in the position of the patient to refuse the surgery or therapy, a causal connection is shown.

*Id.* at 450, 379 A.2d at 1025. Under this standard, "the patient's hindsight testimony as to what he would have hypothetically done, though relevant, is not determinative of the issue." *Id.*

In this case, Dr. Goldberg states that in Maryland a physician's duty to inform the patient that there are other, more experienced surgeons in the locality is not recognized, citing to cases from our sister states, *Whiteside v. Lukson,* 89 Wash. App. 109, 947 P.2d 1263, 1265 (1997) (holding that a surgeon's lack of experience in performing a particular surgical procedure is not a material fact for purposes of finding liability predicated on failure to secure an informed consent); *Ditto v. McCurdy,* 86 Hawai'i 84, 947 P.2d 952, 958 (1997) (holding that a physician does not have an affirmative duty to disclose his or her qualifications to a patient prior to providing treatment); *Foard v. Jarman,* 326 N.C. 24, 387 S.E.2d 162, 167 (1990) (refusing to recognize an affirmative duty on the health care provider to discuss his or her experience where the statute governing the standard of care for informed consent does not); *Abram by Abram v. Children's Hospital of Buffalo,* 151 A.D.2d 972, 542 N.Y.S.2d 418, 419 (N.Y.App.Div.1989) (holding that under the statute governing informed consent there was no breach of duty to disclose the experience of the personnel administering the medical care); and *Duttry v. Patterson,* 565 Pa. 130, 771 A.2d 1255, 1259 (2001) (holding that the surgeon's level of experience was irrelevant to the informed consent claim), each of which affirmatively have held that no such duty exists.

He further asserts that, even if such a duty existed, Mr. Boone failed to demonstrate that, had he been properly informed, he would have not elected to undergo the procedure with Dr. Goldberg and relies upon *Fischer v. Wisconsin Patients Compensation Fund,* 256 Wis.2d 848, 650 N.W.2d 75, 78 (2002) (holding that the proper standard for determining causation in such an informed consent action was " 'whether the alternate forms of care and treatment would have made a

difference, i.e., whether the same or similar injuries would have resulted even if the injured party availed himself or herself of the alternate treatment' "), and *Canterbury v. Spence,* 464 F.2d 772, 791 (D.C.Cir.1972) (rejecting the plaintiff's testimony that he would not have undergone the treatment had he been properly informed and adopting the objective standard of "what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance"), to support this proposition.

■ These arguments contradict the standard set forth by this Court in *Sard, supra,* where we explained that there is no bright-line test, or all-inclusive list of items that must be disclosed by a physician in order to procure an informed consent from a patient. 281 Md. at 444, 379 A.2d at 1022. Although we have acknowledged that "[r]isks, benefits, collateral effects, and alternatives normally must be disclosed routinely," we also have made clear that "other considerations ... may also need to be discussed and resolved." *Dingle v. Belin,* 358 Md. 354, 370, 749 A.2d 157, 165 (2000). What those "other considerations" may be is determined by what information would be material to a reasonable person in the position of the patient having to decide whether to submit to the medical treatment in issue; causality is demonstrated if a reasonable person in the patient's position would have withheld consent to the surgery or therapy had that material data been disclosed. *Sard,* 281 Md. at 444, 379 A.2d at 1022; *Dingle,* 358 Md. at 369, 749 A.2d at 165.

In *Faya v. Almaraz,* 329 Md. 435, 620 A.2d 327 (1993), we recognized that a physician could be required to disclose that he is HIV-positive, if he were. We held that because "it was foreseeable that [the surgeon] might transmit the AIDS virus to his patients during invasive surgery," we were "unable to say, as a matter of law, that [the surgeon] owed no duty to the appellants, either to refrain from performing the surgery or to warn them of his condition." *Id.* at 448, 620 A.2d at 333. In *Dingle, supra,* we recognized that the level of a physician's experience may form the basis for an informed consent action.

In that case a patient sued when she learned that a resident, and not the surgeon, had performed certain aspects of a procedure to remove her gallbladder. We iterated that "a claim for lack of informed consent focuses . . . on the adequacy of the explanation given by the physician in obtaining the patient's consent." *Dingle*, 358 Md. at 369, 749 A.2d 157. Therefore, the level of disclosure that is required to be given by the physician is "measured by the patient's need, and that need is whatever is material to the decision." *Id.* at 370, 749 A.2d at 165. *See also Landon*, 389 Md. at 229, 884 A.2d at 155–56 (stating that the doctrine of informed consent requires a physician to warn his or her patient of all material risks inherent or collateral to the procedure in order to enable the patient to make an informed decision of whether to undergo the procedure); *Reed v. Campagnolo*, 332 Md. 226, 241, 630 A.2d 1145, 1152 (1993) (citing to *Sard* for support of the proposition that a physician must disclose to the patient all information that a reasonable person would need to make his or her decision of whether to undergo the procedure); *Wachter v. United States*, 877 F.2d 257, 260 (4th Cir.1989) (stating that the standard for determining what information must be disclosed by a physician in Maryland is "whether a reasonable person in the patient's position would consider the data significant to the decision whether to submit to a particular treatment or procedure"); *Lipscomb v. Mem'l Hosp.*, 733 F.2d 332, 336 (4th Cir.1984) (holding that, under Maryland law, "the proper test for measuring the physician's duty to disclose risk information is whether such data will be material to the patient's decision").

In this case, the factual context controls. Mr. Boone alleged that it was the combination of his having a pre-existing hole in his dura, which elevated the complexity of his revisionary mastoidectomy, with the fact that Dr. Goldberg had performed only one revisionary mastoidectomy over the past three years, that gave rise to Dr. Goldberg's duty to inform him that there were other more experienced surgeons in the region that could perform the procedure. It was a factual issue for the jury to determine whether a reasonable person,

in Mr. Boone's position, would have deemed this information material to the decision whether to risk having the revisionary mastoidectomy undertaken by Dr. Goldberg.

█ Dr. Goldberg also argues that what Mr. Boone is really pursuing in this lawsuit is a "loss of chance" action and that, in order to succeed under such a claim, Mr. Boone was required to demonstrate that, had he undergone the procedure by a more experienced physician, he would have experienced better results and cites to *Fennell v. Southern Maryland Hospital Center*, 320 Md. 776, 580 A.2d 206 (1990), as stating the proper standard of causation.

█ The doctrine of loss of chance addresses two distinct categories of complaints, the first of which has been referred to as a "definitive loss":

[A] definitive loss ... involves the loss of a chance either of completely avoiding a specific harm or of achieving a fairly definitive favorable result. These types of claims include both materialized losses and anticipated future consequences (including loss of future benefits). A plaintiff might assert, for example, that had the decedent received timely treatment, he would not have died from the disease.

Joseph H. King, Jr., *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences*, 90 Yale L.J. 1353, 1364 (1981). The second category involves "partial or less definitive losses," *id.* at 1364, and typically involves claims that the tort "aggravated a preexisting condition, delayed its cure, failed to slow its progress, accelerated the onset of harm, or will have such effects in the future." *Id.* at 1373. Therefore, even though the patient cannot recover for the preexisting condition, he can recover for negligent acts further exacerbating the condition. *Id.*

█ The purpose behind the doctrine is to enable a patient to recover for injuries that otherwise would be unrecognized under traditional proximate cause analysis:

Courts confronting a personal injury or wrongful death claim invariably focus on the overt harm suffered by the plaintiff. Then, they attempt to determine whether that harm was "probably" caused by the defendant's negligence. If a case calls for an investigation into the victim's chances of avoiding harm, courts generally require a medical expert to testify, with a reasonable degree of medical certainty, that the victim probably would have avoided the harm or achieved a better result but for the defendant's negligence. If the testimony indicates that there was only a fifty percent or lesser chance of avoidance or improvement, this probability is not established, and the defendant prevails.

Stephen F. Brennwald, *Community Proving Causation In "Loss Of A Chance" Cases: A Proportional Approach* 34 Cath. U.L.Rev. 747, 753–54 (1985). Brennwald gives the following example of the theory:

John Doe, who is experiencing severe bouts of coughing, visits his private physician to determine the cause of his symptoms. His physician refers him to a radiologist, who x-rays Doe's chest and discovers Stage One cancer. Suppose further that the average State One patient possesses a statistical forty percent chance of long-term survival. Through carelessness, an individual on the radiologist's staff notifies Doe's private physician that the x-rays were normal, and, as a consequence, the untreated cancer continues to spread. Several months later, Doe's condition drastically worsens, and he again visits his physician. The cancer is finally rediscovered, but unfortunately, it can no longer be treated. Doe's statistical chances of long-term survival are practically nill. Several months later, he dies. His widow brings a wrongful death action, alleging that the delay in a diagnosis caused her husband's death.

At trial, expert testimony reveals that the radiologist was negligent in failing to communicate the correct findings to the patient's physician. Although the evidence shows that the negligence decreased Doe's chances to live by nearly forty percent, however, this is not enough to meet the "more-likely-than-not" standard of proof ... Because the

evidence in Doe's case shows only a forty percent initial chance of survival, the court will direct a verdict for the negligent defendant. The court will find that the probable cause of death is the preexisting condition because, prior to the defendant's negligence, the cancer had already decreased Doe's chances of survival from one-hundred percent to forty percent.

Brennwald, *supra*, at 749–51.

In *Fennell, supra*, we explored a claim for the loss of chance of survival in which the decedent had only a 40% chance of recovery from her illness. We explained that, by loss of chance to survive, we meant "decreasing the chance of survival as a result of negligent treatment where the likelihood of recovery from the pre-existing disease or injury, prior to any alleged negligent treatment, was improbable, i.e., 50% or less." *Fennell,* 320 Md. at 781, 580 A.2d at 208. We held that we were "unwilling to relax traditional rules of causation and create a new tort allowing full recovery for causing death by causing a loss of less than 50% chance of survival." *Id.* at 786–87, 580 A.2d at 211. Thus, in order for a plaintiff to recover for a loss of chance of survival, a plaintiff must prove by a preponderance of the evidence that " 'it is more probable than not that defendant's act caused his injury'." *Id.* at 787, 580 A.2d at 211, quoting *Peterson v. Underwood,* 258 Md. 9, 17, 264 A.2d 851, 855 (1970).

Clearly, an action for loss of chance is a separate and distinct action from that of informed consent; the gravamen of a loss of chance complaint is that the alleged malpractice denied the plaintiff the probability of a better outcome, whereas the gravamen of an informed consent action is that the plaintiff was not informed of specific data material to his or her decision to undergo the treatment at all or at the hands of that particular physician. In the case *sub judice,* Mr. Boone plead and offered evidence that a more experienced surgeon may have had a greater chance of not breaching the standard of care in performing his complex revisionary mastoidectomy and because of that, he was entitled to be so informed. Mr.

Boone did not, however, plead, nor put on any evidence tending to prove that Dr. Goldberg *diminished his prospect* for a better result, which is the gravamen of an action for loss of chance.

For the reasons stated herein, we reverse the judgment of the Court of Special Appeals.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY. COSTS IN THIS COURT AND IN THE COURT OF SPE-CIAL APPEALS TO BE PAID BY THE PETITIONERS AND CROSS-RESPONDENTS.*

BELL, C.J., RAKER and GREENE, JJ., Dissent.

RAKER J., dissenting, in which BELL, C.J., and GREENE, J. join:

I would reverse the judgment of the Circuit Court and grant petitioner a new trial on both liability and damages. As did the Court of Special Appeals, I believe it was error for the trial court to permit questioning of petitioner's expert, Dr. David Schretlen, about his role in the notorious sniper case of Lee Boyd Malvo and that the danger of unfair prejudice warrants a new trial on both liability and damages.[1]

It is well recognized that cross-examination is the principal safeguard against errant expert testimony. Common areas for probing are bias, partisanship, and financial interest of an expert witness. *See* Maryland Rule 5–616(a)(4). Ordinarily, the scope of cross-examination is within the discretion of the trial judge and is limited by the concept of relevancy. It is very common for courts to permit the cross-examiner to try to create an inference of bias in the witness' testimony by showing that the expert witness is a "professional witness"

---

1. The Court of Special Appeals found that petitioner's motion for a mistrial was timely made and preserved for appellate review. *Goldberg v. Boone,* 167 Md.App. 410, 893 A.2d 625 (2006). I agree.

and is for "hire." This bias is often shown by adverting to the witness' frequency of employment by a particular party or attorney. The amount of compensation the expert has received for his participation in the particular case, or even from testifying as an expert on an annual basis, is another area often permitted to elicit bias. Some courts have permitted also cross-examination on the number and frequency of referrals the doctor has received from a particular attorney.

An attempt to show that an expert is a "paid minimizer" is something else, and in my view, is not permissible. It is particularly inappropriate to refer to the Malvo case.[2] First, it is not permissible to cross-examine an expert's opinion in

2. The record shows that appellant offered Dr. Schretlen as an expert in the field of neuropsychology, and that the following transpired during the voir dire of this witness:

"Q: Okay. I mean, you are hired here basically as a minimizer, aren't you?
[Appellant's Counsel]: Objection, Your Honor.
The Court: Overruled.
A: I certainly didn't see myself as being hired as a minimizer. I saw myself being hired as a neuropsychologist.

\* \* \*

Q: Now, the case before that [referring to a case where the doctor had previously been called as an expert witness], that you testified in court, was a criminal case, right?
A: I'm not sure.
Q: Okay. Well, you testified a young man, about 18 years old, and you did a daylong battery of tests on him and he tested abnormal in one or two tests, right?
A: Oh yes. I know who you are speaking of.
Q: Okay. He was only abnormal in one or two tests?
A: That's right.
Q: Okay. And that young man, you were willing to come into court and testify that he might have been brainwashed into murdering 10 people in the sniper thing, isn't that true?
[Appellant's counsel]: Objection, Your Honor.
A: That is absolutely incorrect and outrageous.
The Court: Sustained.
Q: Well let's talk about it for a minute.
A: Yes.
Q: The young man's name—
[Appellant's counsel]: May we approach, Your Honor?"
At the bench, the court sustained the objection, stating that the court was "not going to allow [respondent's counsel] to get into this area."

other cases that have no relation to the litigation. The Malvo/sniper case had no relation to the case at bar other than to elicit prejudice in the minds of the jurors. Second, when the cross-examiner tries to show that the expert "minimizes" the injury, either for a fee or routinely, there is no way that the party calling the expert can show that the accusation is not true other than to have a trial within a trial, and to introduce purely collateral matters to rebut the inference or suggestion. It obviously creates enormous problems to inject another lawsuit into the trial. *See, e.g., Pappas v. Fronczak,* 249 Ill.App.3d 42, 188 Ill.Dec. 308, 618 N.E.2d 878 (1993).

The majority characterizes the "paid minimizer" question as merely "suggesting that Dr. Schretlen might testify in accordance with the position of the person by whom he was paid" and that the question is within the penumbra of allowable questions. Maj. op. at 22. As I have indicated, if the question was to show that Dr. Schretlen was testifying in accordance with the side who retained him, I agree that it would be permissible. But, the question was designed to show that he *minimized* the injuries in other cases, and therefore, he was minimizing the injuries, or damages, in the instant case.

The Court of Special Appeals reasoned as follows:

"We recognize the general rule that '[w]hether to order a mistrial rests in the discretion of the trial judge, and appellate review of the denial of the motion is limited to whether there has been an abuse of discretion.' *Medical Mutual Liab. Ins. Soc'y of Md. v. Evans,* 330 Md. 1, 19, 622 A.2d 103 (1993). The facts of that case, however, persuade us that (1) Dr. Schretlen should not have been asked any questions about his role in the Malvo case, and (2) the danger of unfair prejudice against Dr. Schretlen that resulted from those questions entitle appellant to a new trial on the issue of damages."

*Goldberg v. Boone,* 167 Md.App. 410, 434, 893 A.2d 625, 639 (2006). My only disagreement with the Court of Special

Appeals reasoning is to the remedy. I believe that petitioner is entitled to a new trial on *both* liability and damages.

Chief Judge BELL and Judge GREENE have authorized me to state that they join in this dissenting opinion.